STATE of Minnesota, Respondent,

v.

Cornelius H. JACKSON, Appellant.

No. A07–1239.

Supreme Court of Minnesota.

Oct. 8, 2009.

Melissa Sheridan, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

DIETZEN, Justice.

Appellant Cornelius Jackson was indicted for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), and crime committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2 (2008), for the shooting death of Christopher Lynch. A Hennepin County jury found Jackson guilty of both counts. The district court entered judgment of conviction of first-degree premeditated murder against Jackson, and he was sentenced to life in prison without the possibility of release. We affirm.

On the evening of May 3, 2006, police responded to a report of a shooting in a residential neighborhood in north Minneapolis. When police arrived, Lynch had already been taken to the hospital, where he was pronounced dead. An autopsy revealed that Lynch had been shot 11 to 13 times. Through their investigation, the police learned that Jackson, Lamonte Martin, and Jonard McDaniel chased Lynch and his cousin, Jermaine Mack–Lynch, and shot Lynch.

The State indicted Jackson, Martin, and McDaniel for the murder of Lynch. Specifically, Jackson was indicted for first-degree premeditated murder and crime committed to benefit a gang. The State moved for joinder of the trials of Jackson, Martin, and McDaniel. The defendants objected to the joinder motion. Following a hearing, the court granted the motion. Subsequently, the State successfully moved to sever the McDaniel trial.

During voir dire, the prosecutor exercised a peremptory challenge of potential Juror 43, and Jackson raised a *Batson* challenge. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Initially, the district court denied the peremptory challenge, but after further questioning of the juror, the court concluded that the prosecutor had established a race-neutral reason for striking the potential juror.

At the combined trial, the State's theory was that Lynch was an innocent victim and that his murder was "collateral damage" in an ongoing gang dispute. The State presented evidence that Mack–Lynch was a member of the Tre Tre Crips gang and that the 19 Block Dipset gang was a rival gang to which Jackson, Martin, and McDaniel belonged. The State also presented evidence that the two gangs have had violent encounters.

Mack–Lynch testified that on the day in question, he and Lynch were walking to the home of Mack–Lynch's brother, Charles Pettis. As they were walking, they saw a white Malibu in which Martin was the driver and Jackson and McDaniel were passengers. After the car slowed down and the occupants looked at Mack–Lynch and Lynch, the car stopped, and Jackson and Martin got out and started chasing them.

Mack–Lynch and Lynch ran down the alley to the back of Pettis's house, where Lynch stopped because he was short of breath. Mack–Lynch continued running down the alley, thinking that Jackson and Martin would follow him because he was a gang member. Mack–Lynch then doubled back to the front of Pettis's house and told his brother that "One Nines" were chasing him. Subsequently, they heard gunshots and saw Jackson and Martin in a yard across the street firing shots with handguns into the backyard of a nearby house. Mack–Lynch and Pettis ran across the street and found Lynch wounded in the backyard. McDaniel then drove the white car into the alley. Jackson and Martin jumped in the car and the three drove away. According to Mack–Lynch, Jackson was wearing a black hat, and Martin was wearing a red hat.

Mack–Lynch admitted that he had a 2005 conviction for unlawful firearm possession and that currently he was under indictment for first-degree murder for a 2006 homicide. He denied having made any type of "deal" with the prosecution in exchange for his testimony.

Pettis also testified that he saw Jackson and Martin standing in a yard across the street. Pettis then heard shots fired. He saw Jackson and Martin get into a white car and drive away. Pettis and Mack–Lynch then found Lynch wounded in the backyard. During an interview with the police that same day, Pettis denied knowing the identity of the shooters. But when the investigator left the interview room, Pettis stated in a phone call to a third party: "I know who did it" but "like I'd really tell these motherf* * *ers [police] who shot my cousin." According to Pettis, he lied to the police because he "wanted to deal with it my way" by "getting revenge . . . on the street." Subsequently, Pettis saw physical evidence from the murder scene, changed his mind, and decided to cooperate. On cross-examination, Pettis admitted prior felony convictions for car theft and robbery and that he currently had pending a charge for aggravated robbery. He denied getting a deal from the prosecution in exchange for his testimony.

Ten-year-old S.H., who lived next door, witnessed the shooting from his back porch. He could not see the two shooters' faces, but he did notice both men were wearing hats. Other witnesses testified that they saw two men flee and get into a white car. Witnesses also stated that one of the men was wearing a red baseball cap.

The State presented testimony that Martin, Jackson, and McDaniel made admissions to various gang members regarding their involvement in Lynch's murder. Paris Patton, a member of the 19 Block Dipset gang, and Kiron Williams, a member of the Vice Lords gang, were in federal custody on narcotics charges. They agreed to testify in exchange for the possi-

bility of a reduced sentence in federal court. Both testified that Martin, Jackson, and McDaniel were members of the 19 Block Dipset gang. Patton testified that about three days after Lynch was killed, McDaniel asked him if he had a gun because he had gotten rid of his after using it "on that little boy" who was with Mack–Lynch. About a month after the murder, Patton overheard Jackson say Lynch was on his knees begging for his life when Jackson shot him. Williams testified that McDaniel, Martin, and Jackson all told him they were involved in killing Lynch. According to Williams, Martin bragged to him about chasing Mack–Lynch and then killing the person who was with him. Williams also testified that Jackson told him he chased Mack–Lynch and Lynch, that Mack–Lynch got away, and then he caught up with Lynch, who pleaded for his life before he was shot.

Minneapolis Police Captain Michael Martin, a member of the special operations division, testified as the State's gang expert. He explained that the 19 Block Dipset gang operates primarily on the north side of Minneapolis and has engaged in murders, drive-by shootings, assaults, and drug crimes. He indicated that retaliation and respect are "the foundation for the gang culture." Several other witnesses testified with respect to incidents in which they were shot at or where persons they knew had been killed by gang members. Other police officers also testified regarding incidents involving 19 Block Dipset gang members and criminal activities in north Minneapolis.

The jury found Jackson guilty of first-degree premeditated murder and crime committed for the benefit of a gang (with an underlying crime of premeditated murder). The district court sentenced Jackson to life in prison without release. This appeal followed.

## I.

Jackson argues that the district court erred by granting the State's motion for joinder of his and Martin's cases for trial. Review of joinder decisions requires "an independent inquiry into [whether] any substantial prejudice to defendants . . . may have resulted from" the joinder. *State v. Blanche*, 696 N.W.2d 351, 370 (Minn.2005) (quoting *State v. DeVerney*, 592 N.W.2d 837, 842 (Minn.1999)). Under Minn. R.Crim. P. 17.03, subd. 2(1), a district court should consider the following factors in determining whether multiple defendants' felony cases should be joined for trial: (1) the nature of the offense; (2) the impact on the victim; (3) the potential prejudice to the defendant(s); and (4) the interests of justice. This rule neither favors nor disfavors joinder. *Santiago v. State*, 644 N.W.2d 425, 446 (Minn.2002).

We have approved joinder of criminal trials in cases where codefendants acted in close concert with one another. *E.g.*, *Blanche*, 696 N.W.2d at 371. In doing so, we have emphasized the similarity of the charges and evidence. *Id.*; *State v. Greenleaf*, 591 N.W.2d 488, 499 (Minn. 1999) ("The identical nature of the charged offenses and the nearly identical evidence against each defendant supports the trial court's decision to join [defendants] for trial.").

Jackson argues that he and Martin did not act in close concert, and therefore, the nature of the offenses does not support joinder. The State argues that both Jackson and Martin were charged with the same crimes and that the evidence against them was virtually identical. We agree with the district court that the nature of the offenses favored joinder. Martin and Jackson were charged with the same crimes. As in *Blanche*, the overwhelming "majority of the evidence presented was

admissible against both," 696 N.W.2d at 371, and substantial evidence was presented that both Martin and Jackson worked "in close concert with one another" to kill Lynch, *id.*

Jackson next argues that most of the witnesses were gang members who were neither frail nor vulnerable, and therefore, separate trials would not result in trauma to the victim or other witnesses. Potential trauma to either the victim or an eyewitness to a crime is a factor that weighs in favor of joinder. *Id.* The district court concluded that the State's main witnesses—Jermaine Mack–Lynch, the intended target, and other family members of Lynch's—would be traumatized by multiple trials. And even if Jackson is correct that the witnesses who were also gang members would not be traumatized, the potential trauma to S.H., a 10–year–old boy who saw the murder from his porch, is significant. *See id.* (reasoning that joinder is favored where young children will testify as eyewitnesses to a murder). We agree with the district court's conclusion that this factor supports joinder.

Jackson argues that his alibi defense and attempt to implicate Martin as the shooter were "irreconcilable" with Martin's defenses, and therefore, prejudice arose from the joinder. Joinder is not appropriate when there would be substantial prejudice to the defendant, which can be shown by demonstrating that codefendants presented "antagonistic defenses." *Santiago,* 644 N.W.2d at 446. "Defendants have antagonistic defenses when the defenses are inconsistent and when they seek to put the blame on each other and the jury is forced to choose between the defense theories advocated by the defendants." *Id.*

At trial, Jackson presented evidence that implied McDaniel was one of the shooters, but he presented no testimony that Martin was one of the shooters. Jackson and Martin "regularly adopted the motions and objections of the other." *Id.* at 444 (citing *State v. Hathaway,* 379 N.W.2d 498, 502 (Minn.1985)). The jury was not forced to choose between Jackson's and Martin's defenses; rather, the jury had "to choose between the state's theory of the case and each defendant's theory of the case." *Greenleaf,* 591 N.W.2d at 499 (holding that joinder was proper even though one defendant asserted innocence defense and codefendant claimed intoxication and duress).

The district court found that the interests of justice favored joinder because "separate trials would drag on for a lengthy period of time and ... the evidence is likely to be nearly the same in each trial." Jackson argues that this is "the situation in nearly every case involving multiple defendants," and therefore, the court should focus on providing each defendant a fair trial. We have previously concluded that the length of separate trials is a legitimate factor in deciding to join cases. *State v. Powers,* 654 N.W.2d 667, 675–76 (Minn.2003) (holding that the extended duration of multiple trials favored joinder). Several of the State's witnesses were gang members, and there was some risk that these witnesses would be unavailable or unwilling to testify during another trial. *See Blanche,* 696 N.W.2d at 372 (holding that the risk of gang members' unavailability during a second trial supported joinder). While neither of these interests are determinative, in the absence of substantial prejudice to Jackson, they weigh in favor of joinder. Thus, we conclude that the district court did not err when it granted the State's motion for joinder.

## II.

Jackson argues that the district court erred in denying his request that he

and Martin receive 30 peremptory challenges, or 15 per defendant, during jury selection. The district court ordered that the defendants would be entitled to 20 peremptory challenges, or 10 per defendant. We review the denial of a request for additional peremptory challenges in a jury trial for an abuse of discretion. *See State v. Greer,* 635 N.W.2d 82, 87 (Minn. 2001) ("Trial court decisions relating to the conduct of voir dire will not be overturned absent an abuse of discretion.").

▇ Peremptory challenges are controlled by Minn. R.Crim. P. 26.02 subd. 6, which states in pertinent part:

If the offense charged is punishable by life imprisonment the defendant shall be entitled to 15 and the state to 9 peremptory challenges. For any other offense, the defendant shall be entitled to 5 and the state to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly, and in that event the state's peremptory challenges shall be correspondingly increased.

Where more than one defendant is being tried jointly, peremptory challenges belong to a side, and not an individual defendant. *State v. Greenleaf,* 591 N.W.2d 488, 501 n. 6 (Minn.1999) (citing *United States v. Boyd,* 86 F.3d 719, 723 (7th Cir.1996)).

▇ The peremptory challenge has an important role in the process of impaneling a fair and impartial jury. *See, e.g., State v. Reiners,* 664 N.W.2d 826, 833 (Minn.2003). Despite its importance, however, peremptory challenges "are a creature of statute and are not required by the Constitution[ ]. [I]t is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273,

101 L.Ed.2d 80 (1988) (internal citations omitted). "As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Id.*

Under Minn. R.Crim. P. 26.02, subd. 6, Jackson and codefendant Martin were entitled to 15 peremptory challenges. The rule uses permissive language, placing the matter within the discretion of the district court. Minn. R.Crim. P. 26.02, subd. 6 (stating that the court "may" grant additional peremptory challenges in cases with multiple defendants); *see also State v. Purdy,* 491 N.W.2d 402, 408–09 (N.D.1992) (holding that the trial court did not abuse its discretion by not granting additional peremptory challenges "beyond the number mandated by the rule"). Jackson argues that this court should require additional peremptory challenges for multiple defendants in a criminal case if the defendants have "adverse interests." But we have previously concluded that the respective defense strategies were not antagonistic. Further, Jackson has failed to show that he or Martin disagreed with the peremptory challenges exercised by the other defendant. And the district court was not required, without more, to grant each defendant the same number of peremptory challenges they would have had in a separate trial in order to ensure a fair jury.

▇ In 1965 the Supreme Court stated that "[t]he denial or impairment of the right [to peremptory challenges] is reversible error without a showing of prejudice." *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). But more recently, the Court concluded that although peremptory rights occupy "an important position in our trial procedures," *Batson v. Kentucky,* 476 U.S. 79, 98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), they "are not constitutionally protected

fundamental rights." *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Thus, "the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." *Id.* The loss of a peremptory challenge does not automatically deprive a defendant of a fair trial or require the reversal of his conviction. *United States v. Martinez–Salazar*, 528 U.S. 304, 307, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Barlow*, 541 N.W.2d 309, 311 (Minn.1995). In order to obtain a new trial, a defendant must show not only that he exhausted all of his peremptory challenges but also that there was actual prejudice or bias raised during voir dire. *Barlow*, 541 N.W.2d at 312.

Jackson has failed to show prejudice. Each of the defendants only exercised eight peremptory challenges and therefore did not exhaust their peremptory challenges. Further, Jackson did not allege or prove prejudice caused by the defendants receiving only 20 peremptory challenges. We conclude Jackson is not entitled to a new trial based on the number of peremptory challenges he received.

### III.

Jackson argues that the district court erred in rejecting his challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and sustaining the prosecutor's peremptory strike of a prospective juror. Jackson contends that the district court abused its discretion in allowing the State to strike Juror 43 because the prosecutor's reasons for excluding the juror were a pretext and clearly related to the juror's status as a minority person. We addressed this specific contention, based on the same facts and legal arguments, in *State v. Martin*, 773 N.W.2d 89 (Minn.2009), decided today. In *Martin*, we concluded that the district court properly followed the *Batson* analysis, and that its decision to sustain the peremptory challenge is not clearly erroneous. Our decision in *Martin* compels the same conclusion here. For the reasons stated in *Martin*, we affirm the district court on this issue.

### IV.

Jackson argues prosecutorial misconduct deprived him of a fair trial. Our standard of review of alleged prosecutorial misconduct depends on whether an objection was made at trial. When an objection is made and we conclude the prosecutor committed misconduct, we apply a two-tiered harmless-error analysis. Specifically, in cases involving unusually serious prosecutorial misconduct, we review the conduct to determine whether it was harmless beyond a reasonable doubt. *Wren*, 738 N.W.2d at 390 n. 8 (citing *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974)). For less-serious misconduct, we review the conduct to determine whether it likely played a substantial part in influencing the jury to convict. *Id.*

When an objection is not made to alleged prosecutorial misconduct, we review under a modified plain-error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). The defendant must prove an error was made that was plain. *Id.* If plain error is established, the burden shifts to the prosecution to demonstrate that the error did not affect substantial rights. *Id.* An error affects a defendant's substantial rights only if there is a reasonable probability that the error actually impacted the verdict. *Id.* If these three prongs are met, "the [appellate] court then assesses whether the error should be addressed to ensure

fairness and the integrity of the judicial proceedings." *Id.*

Jackson has identified numerous instances of alleged prosecutorial misconduct that occurred during the questioning of witnesses and during closing argument. Essentially, he asserts four categories of alleged prosecutorial misconduct that occurred during the closing argument.

### 1. Questioning of witnesses

■ Jackson argues that prosecutorial misconduct occurred during the prosecutor's questioning of witnesses. Specifically, he claims that the prosecutor erred by asking one witness if he was in danger from testifying and by using the term "gangster," and not "gang member," in one question.[1] Jackson objected, the objections were sustained, and the jury was ordered to disregard the testimony. Jackson has provided no legal authority to support his argument that the questions constituted misconduct. In some circumstances, such questions may be proper. *See, e.g., State v. McArthur*, 730 N.W.2d 44, 51–52 (Minn.2007) (holding that it is permissible for prosecutors to elicit information about fear or threats in order to explain a witness's reluctance to testify). And even if the questions were improper, any misconduct was harmless beyond a reasonable doubt.[2] The questions were limited, curative instructions were given, and there was overwhelming evidence in support of Jackson's guilt. *See State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005) (holding that prosecutorial misconduct may be cured by district court in-

struction); *see also State v. Wermerskirchen*, 497 N.W.2d 235, 243 (Minn.1993) (same).

### 2. Closing argument

■ Jackson raises several incidents of alleged prosecutorial misconduct. Initially, Jackson argues that the prosecutor misstated the burden of proof during closing argument. Prosecutors improperly shift the burden of proof when they imply that a defendant has the burden of proving his innocence. *See State v. Whittaker*, 568 N.W.2d 440, 451–52 (Minn.1997). A prosecutor's misstatement of the burden of proof is "highly improper" and constitutes misconduct. *State v. Hunt*, 615 N.W.2d 294, 302 (Minn.2000). But an argument that contrasts the reasonable-doubt and preponderance-of-the-evidence standards is not misconduct provided the prosecutor correctly states the reasonable-doubt standard. *Id.*

■ Jackson next contends that the prosecutor attempted to reduce the State's burden of proof. Specifically, the prosecutor told jurors that "when liberty interests are at stake it's only fair" that the burden rest with the prosecution, but even with the presumption of innocence, many people are still convicted and that proof beyond a reasonable doubt was "a stiff burden." Jackson did not object. We have not previously decided whether it is improper for a prosecutor to state that, even with the presumption of innocence, many people are convicted. We conclude that the prosecutor's argument did not misstate the burden

---

**1.** Jackson also claims that the prosecutor, through cross-examination, implied that one of the defense witnesses had been intimidated. The record, however, reveals that the questions related to possible witness collusion, not intimidation. Jackson does not argue that it would be improper to question a witness about collusion.

**2.** For purposes of this appeal, because the alleged misconduct, if any, was harmless beyond a reasonable doubt, we assume without deciding that the prosecutorial misconduct was unusually serious.

of proof or shift the burden of proof; rather, it was a legitimate explanation of the State's burden. Thus, we see no error, let alone plain error. *Cf. Ramey,* 721 N.W.2d at 302 (holding plain error exists where a ruling contravenes case law).

■ Jackson also argues that the prosecutor implied that Martin and Jackson had a duty to testify before the grand jury. The State contends that the prosecutor's argument responded to Jackson's argument. Specifically, the prosecutor responded that objective evidence was presented to the grand jury, that Jackson was "on the run" when the grand jury convened, and that Jackson could have chosen to testify before the grand jury. Defense counsel objected, and the district court sustained the objection. Following a bench conference and direction from the court, the prosecutor stated that Jackson had "no obligation to contribute" at the grand jury proceeding.

■ The prosecutor has the right to fairly meet the arguments of the defendant. *See State v. Simion,* 745 N.W.2d 830, 844 (Minn.2008) (noting that a prosecutor has the right to argue that a particular defense lacks merit); *State v. Hjerstrom,* 287 N.W.2d 625, 628 (Minn.1979) (holding that the State is permitted to introduce evidence that defendant refused to speak to police after defense counsel attempted to create the impression that police "had not shown any real interest in getting defendant's version of the events"). The prosecutor's argument that Jackson could have chosen to testify before the grand jury may have crossed the line. But Jackson has failed to establish prejudice under a harmless-error analysis. This was a brief comment by the prosecutor in a 75–page closing argument. Any potential misconduct was mitigated by the court's correction of the prosecutor, and the evidence of Jackson's guilt was strong.

*See Pendleton,* 706 N.W.2d at 509. Thus, any potential misconduct was harmless beyond a reasonable doubt.

■ Also, Jackson argues that the prosecutor impermissibly vouched for witnesses during closing argument. Prosecutorial misconduct occurs "when the [prosecutor] implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Patterson,* 577 N.W.2d 494, 497 (Minn.1998) (quoting *United States v. Beasley,* 102 F.3d 1440, 1449 (8th Cir.1996)). Further "testimony relating to the existence, the terms, including any truthfulness provision, and the witness's understanding of the plea agreement between the witness and the state, without more, does not constitute vouching." *Patterson,* 577 N.W.2d at 498. While a prosecutor must not personally endorse a witness's credibility, the State may, in closing argument, argue that a witness was or was not credible. *State v. Jackson,* 714 N.W.2d 681, 696 (Minn. 2006).

■ Many of the witnesses agreed to testify in order to possibly reduce their sentences on criminal charges pending in federal court. The prosecutor outlined the procedures for sentencing consideration in federal court, and stated that "checks and balances" were in place to ensure that cooperating defendants "better tell the truth" or they would lose their plea bargain. Jackson's objection to this argument was overruled. We conclude that the prosecutor's explanation was objective and a fair comment.

■ The prosecutor stated: "if you don't tell the truth, you are screwed, lewd and tattooed." The prosecutor then stated: "Fortunately at a prior hearing [the witness] decided to do the right thing[,]" and "If I can turn a kid away from taking

it out on the street and killing. . . ." Jackson objected to these statements, and the objections were sustained. We conclude that although the first statement was vulgar, none of these statements constituted vouching for the witness's credibility. Instead, the statements were inartful attempts to argue that witnesses were credible. Moreover, the jury was instructed to disregard the statements. Thus, any possible misconduct by the prosecutor was harmless. *See Pendleton,* 706 N.W.2d at 509.

In addition, Jackson claims that the prosecutor inflamed the jurors' prejudices. Specifically, the prosecutor stated: "Welcome to the real world of gangs and gang violence. This is what happens on the streets of North Minneapolis." Jackson argues that these statements implied to the jury that African Americans in north Minneapolis have different values and lifestyles. The State argues that the prosecutor was not attempting to inflame the prejudices of the jury; rather he was attempting to explain testimony from witnesses that may not be likeable to most jurors.

"[W]e have repeatedly emphasized that it is improper for the state to highlight a defendant's racial or socioeconomic status as a way to put evidence in context." *State v. Dobbins,* 725 N.W.2d 492, 512 (Minn.2006) (citing *State v. Ray,* 659 N.W.2d 736, 746 (Minn.2003)). Thus, we have concluded that where the prosecutor invited the jurors to view the incident as "involving three black males in the hood in North Minneapolis" as a world wholly outside their own, that the argument invited the jury to apply racial and socio-economic considerations that would deny a defendant a fair trial, and therefore was misconduct. *Ray,* 659 N.W.2d at 746–47. The prosecutor specifically referred to the defendants by race. *Id.* at 746. But where a

prosecutor's comments that the defendant was not from the same world as the jurors are limited to preparing the jury for evidence of an unfamiliar world involving drugs, such comments do not constitute misconduct. *See Wren,* 738 N.W.2d at 392 (holding that a prosecutor's references to north Minneapolis are not improper when designed to prepare the jurors for an unfamiliar world of drugs and violence); *State v. Paul,* 716 N.W.2d 329, 340 (Minn.2006) (holding that prosecutor's argument that murder took place in "real world" where witnesses were not perfect, without mentioning race and culture and where remarks were brief and not demeaning, was not plain error); *Jackson,* 714 N.W.2d at 695 (holding that prosecutor's references to "gang world" were proper where designed to introduce jurors to unfamiliar behaviors and mores of gang culture). Thus, a prosecutor's comments cross the line when they refer to the racial or socioeconomic background of the defendant or the witnesses in a manner implying that defendant should be convicted because he was from this environment.

We conclude that the prosecutor's argument did not constitute misconduct. The prosecutor did not refer to any party or witness by race. The majority of the prosecutor's witnesses were gang members who had criminal records. The prosecutor was not demeaning, did not go on at length about the "gang world," and did not invite the jury to compare its own world to the world described. On this record, it was not misconduct for the prosecutor to comment about "the real world of gangs and gang violence."

Jackson next argues that the prosecutor inflamed the jurors' prejudices by stating that two of the State's witnesses were not college educated and were from north Minneapolis. In essence, the prosecutor argued that the witnesses were not

college-educated police officers or witnesses trained to record facts and details, but rather, they were ordinary people. On this record, we conclude that the prosecutor's argument did not constitute misconduct. The prosecutor's argument responded to the defense's suggestions that these witnesses' testimony should not be trusted because they could not recall precise details of every moment of the shooting.

 Finally, Jackson argues that the prosecutor disparaged his defense. A prosecutor may argue that there is no merit to a particular defense but may not belittle the defense, either in the abstract or by suggesting that the defense was raised because it was the only defense that might succeed. *State v. Griese,* 565 N.W.2d 419, 428 (Minn.1997) (collecting cases). Jackson presents several instances of this type of alleged misconduct.[3] In previous cases, we have addressed claims of alleged prosecutorial misconduct that are virtually identical to Jackson's claims, yet he has not cited any of these cases in his brief. *See, e.g., Simion,* 745 N.W.2d at 844 (holding it was not misconduct for a prosecutor to argue in closing argument that the defendant was trying to "dirty up" the victim during trial); *State v. Atkins,* 543 N.W.2d 642, 647–48 (Minn.1996) (holding the prosecutor's statement that it would be an "unspeakable injustice" to convict the defendant of a lesser-included

offense was not misconduct). We have reviewed these comments, and we conclude that none of them constitutes prosecutorial misconduct.

## V.

 Jackson argues that the State did not sufficiently prove that the murder was committed "for the benefit of a gang," and therefore his conviction for crime committed for the benefit of a gang should be overturned.[4] The State argues that this claim is moot.

Jackson was convicted of and sentenced for first-degree murder. Judgment of conviction was not entered for crime committed for the benefit of a gang, nor was Jackson sentenced for this offense. Because he was not convicted of or sentenced for crime committed for benefit of a gang, the issue of whether there was sufficient evidence to convict him on that count is moot. *See State v. Swanson,* 707 N.W.2d 645, 659 n. 4 (Minn.2006) ("Because sufficient evidence exists to uphold Swanson's kidnapping conviction, we need not address Swanson's claim that, because there is insufficient evidence supporting his kidnapping conviction, he is entitled to a new trial due to insufficient evidence for one of the alternative felonies underlying his conviction for first-degree felony murder[.]"); *see also Commonwealth v. Candelario,* 446 Mass. 847, 848 N.E.2d 769, 778 (2006)

---

**3.** Jackson claims that the prosecutor committed misconduct by stating during closing argument that (1) a conviction of only the lesser-included offenses would cause an "unspeakable injustice" and that the jurors should not be tempted "to compromise on justice" by convicting of a lesser offense; (2) Mack–Lynch's pending murder charges had been introduced by the defendant "to smear his character in your eyes"; and (3) he was personally offended by some of the defense counsel's arguments.

**4.** Jackson also argues that because the gang-related testimony was so omnipresent at trial, it must have had a strong effect in the jury's deliberations on both counts. As a result, he asks this court to overturn his first-degree murder conviction. We disagree. Jackson is not arguing that the gang-related testimony was improperly admitted at trial. And there was overwhelming evidence of Jackson's guilt of first-degree premeditated murder, including eyewitness testimony from Mack–Lynch and Pettis, which was corroborated by the testimony of several neighbors, and Jackson's admission to others that he shot Lynch.

(holding that the issue of the sufficiency of evidence to support a theory of murder with extreme atrocity or cruelty was moot where there was no dispute that evidence was sufficient to support alternative theory of deliberate, premeditated murder). We therefore conclude that this issue is moot.

## VI.

We turn next to Jackson's seven pro se arguments. First, Jackson argues that the indictment was inadequate. Specifically, he complains that the indictment was not found or returned as required by law. Jackson also complains that the indictment, complaint, or tab charge did not substantially comply with the requirements prescribed by law and that his substantial rights were thereby prejudiced.

But Jackson fails to specifically indicate how the indictment against him did not conform to the law. There is no evidence, either in allegations from Jackson or on the record, that the indictment was not returned in full accordance with the law.

Second, Jackson claims that the court lacked jurisdiction over the offense charged. The State of Minnesota has jurisdiction over a crime when the offense occurs in Minnesota. Minn.Stat. § 609.025 (2008). The trial shall be held in the county and district in which the crime occurred. Minn. Const. art. I, § 6. Here, the murder was committed in Hennepin County. Therefore, Minnesota has jurisdiction, and Hennepin County was the correct venue.

Third, Jackson alleges prosecutorial and judicial misconduct. He claims that the prosecutor "knowingly and intentionally" presented false evidence to the grand jury and allowed various witnesses to testify falsely. But Jackson fails to

present any evidence or specify legal authority to support his position. *See Schoepke v. Alexander Smith & Sons Carpet Co.*, 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.").

Fourth, Jackson claims that the district court erred in accepting the testimony of Sergeant Dunlap but refusing to play audio and video evidence of the scene because the police officer who made the tape was not available to testify. Jackson claims that the video would have demonstrated that the eyewitnesses' location prevented them from observing what they claimed to have observed. But the photographs admitted into evidence showed the location of the witnesses, and they gave Jackson the ability to argue that the eyewitnesses did not have the opportunity to observe what occurred. Thus, the argument lacks merit.

Fifth, Jackson argues that his trial counsel was ineffective. He specifically points to his counsel failing to object to the State's expert gang testimony.[5] While Jackson's counsel did not object *during* trial, he filed a memorandum with the court *prior* to trial opposing the introduction of *any and all* gang evidence.

Sixth, Jackson argues that there were discovery violations. While testifying regarding a police report, Sergeant Dunlap referred to notes of a conversation with Paris Patton in which Patton told Dunlap of a few statements made by Jackson to Patton that were not in the report. Defense counsel objected to this testimony,

---

**5.** He also asserts that his counsel knew that the prosecution was offering false evidence and testimony. But, once again, there is no evidence that there was false testimony, let alone that defense counsel knew about it.

and the introduction of those notes, as they had not received them during discovery. In response, the prosecutor agreed to provide defense counsel with the notes.

Although the failure to disclose the notes may have been a discovery violation, it was harmless. *State v. Greenleaf*, 591 N.W.2d 488, 506 (Minn.1999) (holding that a discovery violation was harmless where the evidence was "not of great importance" and the other evidence weighed strongly against defendant). Specifically, Jackson was aware that the State intended to call Sergeant Dunlap to testify regarding her conversations with Paris Patton, and he had the opportunity to interview both of them. Also, defense counsel had an opportunity to cross-examine Patton at trial regarding those conversations.

■ Seventh, Jackson argues that the district court erred in allowing Charles Pettis to testify after he heard some testimony from another witness. Pettis admitted to having entered the courtroom while another witness, Mack–Lynch, was testifying, in violation of the district court's sequestration order. The district court questioned him, and he stated that he had heard Mack–Lynch being questioned about who called the police. The district court held that it would allow Pettis to testify and that the defense could use the sequestration violation for impeachment. Jackson has not, however, demonstrated any prejudice. *State v. Erdman*, 383 N.W.2d 331, 334 (Minn.App.1986) (refusing to overturn a conviction where defendant showed only a possible sequestration violation and no prejudice).

Affirmed.

Dissenting, PAGE and ANDERSON, PAUL H., JJ.

PAGE, Justice (dissenting).

For the reasons set forth in my dissent in *State v. Martin*, 773 N.W.2d 89 (Minn. 2009), I respectfully dissent.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.