*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0031**

State of Minnesota,
Respondent,

vs.

Lorenzo Leontay Washington,
Appellant.

**Filed February 16, 2016**
**Affirmed**
**Bjorkman, Judge**

Hennepin County District Court
File No. 27-CR-13-29611

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Charles F. Clippert, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Ross, Judge; and Larkin, Judge.

**UNPUBLISHED OPINION**

**BJORKMAN**, Judge

Appellant challenges his convictions of aiding and abetting attempted second-degree murder and aiding and abetting second-degree assault, arguing that the district court

improperly admitted *Spreigl* evidence, the prosecutor engaged in prejudicial misconduct, the evidence was insufficient to sustain the attempted-murder conviction, and the district court's sentencing decision was improperly influenced by appellant's exercise of his trial rights. We affirm.

**FACTS**

Appellant Lorenzo Leontay Washington was charged with aiding and abetting second-degree assault, aiding and abetting attempted first-degree aggravated robbery, and aiding and abetting attempted second-degree murder following a July 11, 2013 incident. The state alleged that on that day, Washington, Cartrell Smith, and O.W. confronted D.P., chased him for several blocks on their bicycles, and then shot him. Washington and Smith's cases were joined for trial. The jury acquitted both men of attempted aggravated robbery, but could not agree on a verdict on the other charges. Washington and Smith were retried together on the assault and attempted second-degree-murder charges.

At the second trial, D.P. testified about the relationships among the various individuals. In 2010 or 2011, Juwon Osborne—also known as "Skitz"—shot D.P. D.P. did not report this incident to the police because he did not want to be called a "snitch."[1] He knew that Osborne and Washington were associated, and he had issues with Washington. In 2012, D.P. and Washington resided together at a treatment facility. While at the facility, the two argued after Washington told other residents that Osborne shot D.P.'s testicles off. D.P. described himself and Washington as "always . . . in a conflict."

---

[1] Subsequently, Osborne was fatally shot.

D.P. also testified about the July 11, 2013 shooting. On that day, he was confronted by a group of individuals on bicycles, one of whom called out the name "Skitz." D.P. recognized several of the individuals, including Washington, Smith, and O.W. D.P. fled on his bicycle, and the group followed. When D.P. was approximately one block from his friend J.J.'s house, he heard gunshots and a "ting sound" on his bicycle, which he thought was made by a bullet. D.P. attempted to enter J.J.'s house, but no one responded when he knocked on the door and windows. While standing in J.J.'s backyard, D.P. saw Smith holding a gun in the middle of the street and Washington standing near the front of the house. D.P. attempted to run and heard Washington say, "there he goes, there he goes." Smith shot at D.P. four times, hitting him in the buttocks. The group then rode away on their bicycles.

After he was shot, D.P. saw a police car approaching and went to the officer for help. D.P. told Officer Michael Killebrew that he had been shot and that Washington and O.W. were members of the group that shot him. D.P. testified that he did not identify the shooter at that time because he did not "want to be telling on nobody." D.P. was then transported to North Memorial Hospital.

Sergeant Kelly O'Rourke testified that he spoke with D.P. in the hospital five days after the shooting. D.P. reported that Washington and O.W. were in the group that confronted him, and that Smith shot him. D.P. again stated that a member of the group called out "Skitz," and that Washington was the person who said "there he is, there he is" before the shots were fired. On July 18, Sergeant O'Rourke returned to the hospital with

3

his partner, who administered a photo lineup. D.P. again identified Washington, Smith, and O.W., and stated that Smith was the shooter.[2]

Sergeant O'Rourke also testified that he reviewed video footage from public-safety cameras located in close proximity to the shooting, but the footage did not contain relevant information. A defense investigator also reviewed the footage and testified that it did not show any type of chase, but revealed one or two people riding bicycles in a casual manner. A map showing the location of the cameras demonstrates that none are present at the intersection where the shooting occurred.

The jury found Washington guilty of aiding and abetting second-degree assault and aiding and abetting attempted second-degree murder. Washington moved for a downward dispositional sentencing departure. The district court denied the motion and imposed a presumptive 131-month sentence. Washington appeals.

## DECISION

**I.     The district court did not abuse its discretion by admitting evidence of prior contact between Washington and D.P. without conducting a *Spreigl* analysis.**

As a general rule, relevant evidence is admissible. Minn. R. Evid. 402; *State v. Swinger*, 800 N.W.2d 833, 839 (Minn. App. 2011), *review denied* (Minn. Sept. 28, 2011). Evidence of motive is typically relevant—even when not an element of the charged offense—because it can explain the reason for a person's actions. *See State v. Ness*, 707

_____

[2] D.P. previously testified at O.W.'s trial that Washington, Smith, and O.W. were present at the scene, but he did not know the identity of the shooter. At Washington and Smith's second trial, D.P. explained that he did not identify Smith as the shooter at O.W.'s trial because he did not want to be a "snitch," and he was concerned for his safety.

N.W.2d 676, 687 (Minn. 2006). But "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). Such evidence may be admissible for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *Id.*; *State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). We review a district court's evidentiary ruling for an abuse of discretion. *State v. Loving*, 775 N.W.2d 872, 879 (Minn. 2009).

Washington challenges the admission of D.P.'s testimony that Washington associated with Osborne, that D.P. and Washington argued in 2012 at a treatment facility, and that D.P. and Washington were "always . . . in a conflict." The testimony did not include details of the contacts and relationship between Washington and D.P., and did not reference criminal acts or gang affiliation. In short, the challenged testimony provided background about how D.P. and Washington knew each other, and Washington's potential motive for the shooting. Because we conclude that this does not constitute *Spreigl* evidence, the district court was not required to conduct the five-step process for admitting such evidence. *See Ness*, 707 N.W.2d at 686 (stating the five-step analysis for admitting *Spreigl* evidence). And even if this evidence did constitute *Spreigl* evidence, it was admissible because it explained the relationship between Washington and D.P. and established a motive for the commission of the offense. *State v. Schweppe*, 306 Minn. 395, 402, 237 N.W.2d 609, 615 (1975); *see also Ness*, 707 N.W.2d at 687 (stating that although motive is not an element of most crimes, the state is usually entitled to present motive evidence to help explain the reason for an act).

5

Although we discern no abuse of discretion by the district court in admitting this evidence, we note that any prejudicial effect is minimal. The court did not permit any references to gang affiliations and there was no suggestion that Washington's prior encounters with D.P. constituted criminal activity. Moreover, any prejudice that occurred by admitting evidence of the incident at the treatment facility and the continued animosity between Washington and D.P. also worked against the state. The strained relationship between Washington and D.P. could provide an incentive for D.P. to lie, which the defense expressly asserted in its closing argument.

## II. The prosecutor did not commit prejudicial misconduct.

Washington argues that the prosecutor engaged in both unobjected-to and objected-to misconduct. We look at the trial as a whole to determine whether prosecutorial misconduct warrants a new trial. *See State v. Johnson*, 616 N.W.2d 720, 727-28 (Minn. 2000) (stating when courts consider claims of prosecutorial misconduct in closing argument the arguments are considered as a whole); *see also State v. Hoppe*, 641 N.W.2d 315, 321-22 (Minn. App. 2002) (holding that a new trial was warranted after considering all instances of prosecutorial misconduct), *review denied* (Minn. May 14, 2002). We apply a different standard of review to unobjected-to and objected-to misconduct. Accordingly, we address each category in turn.

### Unobjected-to misconduct

We review unobjected-to prosecutorial misconduct under a modified plain-error standard, considering whether there is "(1) error, (2) that is plain, and (3) affects substantial rights." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). On the third element, the

6

state bears the burden of proving that the misconduct did not affect the defendant's substantial rights. *Id.*

Washington first argues that the prosecutor disparaged the defense when he stated that one of its theories was "absurd" and argued that the defense investigator "cherry-picked" the photographs he described. We are not persuaded. In *Hoppe*, we held that a prosecutor committed misconduct when he stated the defendant's argument was "ridiculous" and told the jury not to be "snowed" by the defense. 641 N.W.2d at 321. But in *State v. Matthews*, our supreme court held that a prosecutor did not engage in misconduct by describing the defense's explanation of events as "concocted," "ridiculous," and "unbelievable." 779 N.W.2d 543, 552 (Minn. 2010). The supreme court reasoned that the prosecutor's statement was directed at witness credibility rather than the defendant's broader theory of defense. *Id.* We conclude this case is more like *Matthews*. The prosecutor's statements, considered in context, urged the jurors to find D.P.'s testimony credible. As such, they do not amount to misconduct.

Next, Washington contends that the prosecutor committed misconduct by telling the jury that their duty was to find the truth. In *State v. Ashby*, the supreme court concluded that the prosecutor's admonition to the jury to "keep its eyes on the prize" of truth was not misconduct because the statement was made in the context of the jury's duty to evaluate witness credibility. 567 N.W.2d 21, 28 (Minn. 1997). Similarly, in *State v. Bailey*, the supreme court held that it was not misconduct for the prosecutor to tell the jurors they were "truth seekers" and to argue that they should "search for the truth in the evidence." 677 N.W.2d 380, 403 (Minn. 2004). Here, the prosecutor referred to the jury's duty to find the

7

"truth" or render a "true verdict" on at least eight occasions. But the majority of these references were made in the context of evaluating the credibility of witness testimony, particularly D.P.'s credibility, on which the state's case largely turned. On this record, we discern no misconduct.

Washington also asserts that the prosecutor improperly shifted the burden of proof to the defense by arguing that "if someone wanted to challenge [D.P.]'s assessment that [Washington and Osborne] were aligned, someone could have done that." This argument has merit. A prosecutor may not comment on a defendant's failure to contradict testimony. *State v. Porter*, 526 N.W.2d 359, 365 (Minn. 1995) (concluding that arguing testimony is "uncontradicted" or is "without impeachment by any cross-examination" constitutes misconduct). By suggesting that Washington should have presented evidence regarding Washington's claimed association with Osborne, the prosecutor violated clear precedent, thereby committing misconduct.

Because we conclude that the prosecutor committed misconduct, we must determine whether Washington's substantial rights were affected. *See Ramey*, 721 N.W.2d at 302 (stating that the state must prove there is no reasonable likelihood that the absence of the misconduct would have significantly affected the jury's verdict). Washington cites *Porter*, where our supreme court held that the prosecutor's misconduct was *not* harmless beyond a reasonable doubt. 526 N.W.2d at 365-66. But that conclusion was not solely based on the prosecutor's improper burden-shifting comment. *Id*. Rather, the prosecutor's misconduct in *Porter* included appealing to the passions and prejudices of the jury, arguing the consequences of the jury's verdict, bolstering the credibility of the state's expert witness,

8

distorting the burden of truth, and alluding to the defendant's failure to contradict certain testimony. *Id.* (stating that the prosecutor's misconduct "permeated the entire closing argument").

In contrast, the prosecutor's misconduct here falls substantially short of *Porter*'s mark. The misconduct consisted of one improper burden-shifting statement; it did not permeate the entire closing argument. The improper statement was only one sentence out of a closing argument and rebuttal that spanned approximately 45 pages. *See Matthews*, 779 N.W.2d at 552 (stating misconduct limited to "a few lines in a 48-page closing argument" did not affect defendant's substantial rights). Accordingly, we conclude that the misconduct did not affect Washington's substantial rights.

**Objected-to misconduct**

When an objection is made at trial, we first determine whether the prosecutor engaged in misconduct, and then apply a "two-tiered harmless-error analysis." *State v. Jackson*, 773 N.W.2d 111, 121 (Minn. 2009). If the misconduct is unusually serious, the court must decide whether it was harmless beyond a reasonable doubt. *Id.* If the misconduct is less serious, we consider whether it likely played a substantial part in influencing the jury's verdict. *Id.*

Washington argues that the prosecutor committed misconduct by asking the defense investigator, on cross-examination, "[s]o your job isn't to find the truth, right?" Washington offered no legal basis for his objection, but asserts on appeal that the question disparaged the defense. Washington points to *State v. Griese* for the proposition that disparagement occurs when the prosecutor argues that a particular defense was presented

9

because it was the only one that could succeed. 565 N.W.2d 419, 427 (Minn. 1997). Because the prosecutor made no such argument, we are not persuaded. Washington also argues that the question implied that the investigator was not testifying truthfully. The prosecutor asked the investigator about his job duties, if he worked for the defense, and whether his job was to assist the defense. The objected-to question may have more directly challenged the investigator's credibility but we do not view this as outside the scope of permissible cross-examination. Moreover, the state essentially conceded the primary substance of the investigator's testimony—that the chase and the shooting did not appear on any of the video footage. On this record, we discern no prejudicial error.

### III.   The evidence was sufficient to prove that Washington aided and abetted attempted second-degree murder.

When considering a sufficiency-of-the-evidence challenge, our review is limited to determining whether the evidence was sufficient to permit the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We review the evidence in the light most favorable to the verdict and assume that the fact-finder disbelieved any testimony conflicting with that verdict. *State v. Chavarria-Cruz*, 839 N.W.2d 515, 519 (Minn. 2013); *State v. Hokanson*, 821 N.W.2d 340, 353 (Minn. 2012). We defer to the fact-finder's credibility determinations, *State v. Buckingham*, 772 N.W.2d 64, 71 (Minn. 2009), and will not disturb a verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

10

Washington asserts that the evidence was insufficient to prove that he was involved in the shooting. We disagree. Identification is a question of fact for the jury to decide. *State v. Oates*, 611 N.W.2d 580, 586 (Minn. App. 2000), *review denied* (Minn. Aug. 22, 2000). D.P. testified that Washington was one of the individuals who pursued him on the day in question and that Washington shouted "there he goes, there he goes" immediately before Smith shot him. D.P. identified Washington in his initial contact with Officer Killebrew, his interview with Sgt. O'Rourke at the hospital, during a photo lineup, during O.W.'s trial, and again in court during Washington's trial. Whether D.P.'s testimony was credible is a jury determination to which we must defer. *Buckingham*, 772 N.W.2d at 71. Because a verdict can be based on the testimony of a single credible witness, we conclude that the evidence is sufficient to support Washington's conviction. *See Caldwell v. State*, 347 N.W.2d 824, 828 (Minn. App. 1984).

## IV. The district court's sentencing decision was not improperly influenced by Washington's decision to exercise his constitutional trial rights.

We review sentences imposed by a district court for abuse of discretion. *State v. Delk*, 781 N.W.2d 426, 428 (Minn. App. 2010), *review denied* (Minn. July 20, 2010). It is a "rare" case in which we reverse a sentence within the presumptive guidelines range. *Id.* But the fact that a defendant exercises his constitutional trial rights must have no bearing on his sentence. *State v. Mollberg*, 310 Minn. 376, 388, 246 N.W.2d 463, 471 (1976). On appeal, the record must show that the district court sentenced the defendant based on the facts of the case and his personal history, and not as a punishment for pleading not guilty. *State v. Knaak*, 396 N.W.2d 684, 689 (Minn. App. 1986).

11

Washington argues that the district court imposed a 131-month presumptive sentence based, at least in part, on Washington's decision to exercise his trial rights. He points out that during a May 5, 2014 pretrial hearing, the district court stated the following while in chambers:

> So I don't know what a jury would do, but I think that under the circumstances probation is a reasonable offer given the fact [that the defendants have] already spent a year in. And I'm not saying that [the state] should do that. I'm saying that under the circumstances on a straight plea I would do that . . . .

Washington asserts that these statements create an inference that the district court punished him for pleading not guilty and going to trial.

Washington cites *United States v. Medina-Cervantes* to support his assertion that his sentence was improperly influenced by his decision to stand trial. 690 F.2d 715, 716-17 (9th Cir. 1982). In that case, the sentencing judge stated that the defendant's insistence on proceeding to trial cost the government money, and reflected the defendant "thumbing his nose at [the] judicial system." *Id.* at 716. The Ninth Circuit vacated the defendant's sentence because there was nothing in the record to rebut the inference that a more severe sentence was imposed because the defendant exercised his trial rights. *Id.* at 716-17. In contrast to *Medina-Cervantes*, the record before us rebuts the inference that Washington was punished for pleading not guilty.

First, the district court's statement concerning a probationary sentence was made in the context of the parties' plea negotiations. On May 5, the district court ruled on various pretrial motions—primarily evidentiary motions—in open court. The attorneys and the judge then continued discussing the trial in chambers. The conversation in chambers

12

largely focused on whether the state intended to proceed with trial. In light of that discussion, the judge's statements appear to have been directed toward the state to advance a settlement offer, rather than toward Washington to encourage him to plead guilty.[3]

Second, the district court articulated several grounds for its decision at the sentencing hearing. These reasons included Washington's rehabilitative-treatment history, criminal history, known gang affiliation, and present conviction. This shows that the district court based its sentencing decision on the facts of the case and Washington's personal history. On this record, we conclude that Washington was not punished for exercising his trial rights.

**Affirmed.**

---

[3] The district court was encouraging plea negotiations, but the parties do not contend that the court's involvement in the negotiations was excessive. *See State v. Anyanwu*, 681 N.W.2d 411, 414-15 (Minn. App. 2004) (stating that a court should not inject itself into plea negotiations and step into the position of one of the parties to the negotiation).