*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1157**


State of Minnesota,
Respondent,

vs.

Khalil Anwar Dykes,
Appellant.


**Filed June 20, 2016
Affirmed
Bjorkman, Judge**


Hennepin County District Court
File No. 27-CR-14-28294

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**BJORKMAN**, Judge

Appellant challenges his conviction of first-degree criminal sexual conduct, arguing that he was deprived of a fair trial because the prosecutor committed prejudicial misconduct while cross-examining him. We affirm.

## FACTS

On September 24, 2014, A.P. called 911 to report that she had just been raped in her home. She described the assailant as an African-American male wearing black Converse sneakers with white laces, and reported that he might have a box cutter. She did not see his face, but indicated that her roommate, A.H., might know him. When the police arrived, A.P. stated that the assailant's voice sounded like that of A.H.'s boyfriend, appellant Khalil Anwar Dykes. A.P. recounted the assault and then went to the hospital to be examined by a sexual-assault nurse.

Hennepin County Sherriff's Deputy Ethan Weinzierl and his canine partner assisted by tracking the assailant. During the search, witness A.A. reported that earlier in the day he had observed an African-American male walking down the alley and looking back and forth in a "shifty" manner. The man threw something onto the ground near the end of the alley and then drove away in a red car. Deputy Weinzierl and his canine partner discovered a used condom in a planter located in the area described by A.A.

Two Richfield police officers at the scene noticed a car drive by that matched the description provided by A.A. They stopped the car, identified Dykes as the driver, and arrested him. A search of the car revealed a pair of black sneakers with white laces.

While in custody, Dykes initially denied being at A.P.'s residence earlier that day. He explained that he had not been welcome at the residence since the previous winter, and provided a detailed account of where he had been that morning. When the interviewing officers told Dykes that a witness saw an individual matching his description get into a red car near A.P.'s house, Dykes responded that he had parked near the house but he had not gone inside. When the officers told Dykes they found a used condom and were testing it for DNA, Dykes replied that he did not carry condoms and that the used condom would not contain his DNA.

Dykes's story continued to evolve as the interview progressed. He eventually admitted having sexual intercourse with A.P. in her residence. But he claimed it was consensual. He also admitted throwing the condom into the weeds. Later that day, officers interviewed Dykes a second time. When asked if he held a box cutter to A.P.'s throat during the sexual encounter, Dykes denied having any sort of weapon. But he acknowledged keeping a screwdriver in his backpack for protection because he lived in North Minneapolis. A screwdriver and condoms were found in the same pocket of his backpack.

Respondent State of Minnesota charged Dykes with first-degree criminal sexual conduct. At trial, A.P. testified that on the day of the assault she was at home writing a letter to her boyfriend, who was away at boot camp. She heard a knocking sound. No one was at the front door, so she checked the back door and discovered it was slightly ajar. She closed it and returned to her room. As she was passing A.H.'s room, she looked inside and saw someone hiding under a comforter. The person then threw the comforter over her head

3

and dragged her into the bathroom while holding something sharp against her neck. In an effort to stop the assailant, A.P. stated that she had just had a miscarriage. But the assailant did not stop and forcibly penetrated her. She did not see his face, but saw that he was wearing black Converse sneakers with white laces and that he was African American. She identified the shoes discovered in Dykes's car as the shoes the assailant was wearing. A.P. testified that the assailant then dragged her into A.H.'s room and told her not to move until he was gone or he would kill her.

The sexual-assault nurse testified that when she met A.P. in the emergency room, A.P. was crying hard and having a difficult time speaking. During the examination, the nurse discovered a three centimeter laceration at the bottom of A.P.'s vaginal opening. The nurse opined that such an injury is rare and caused by forceful impact.

Dykes testified that on the date in question, he dropped off A.H. at work and then went to A.P.'s house and asked her if she "want[ed] to kick it today," to which A.P. responded she did. The two ate breakfast together, and then A.P. asked if he had a condom. A.P. then got a condom, retrieved the comforter from A.H.'s room, and started kissing him. The two engaged in consensual sexual intercourse in the bathroom, until A.P. stated, "Maybe I shouldn't be doing this. I just had a miscarriage." Dykes immediately stopped and looked into A.H.'s room, noticing flowers he had given her; it then dawned on him that he was cheating on her again. Dykes immediately left to tell A.H. what happened, but was stopped by the police.

4

The jury found Dykes guilty. Dykes moved for judgment of acquittal and a new trial. The district court denied the motions and sentenced Dykes to 172 months in prison. Dykes appeals.

**D E C I S I O N**

Dykes argues that the prosecutor engaged in misconduct while cross-examining him warranting a new trial. Specifically, Dykes argues that his cross-examination "was saturated with argumentative statements, snide comments, and remarks communicating disbelief in Dykes's testimony." He argues that the prosecutor "intentionally engaged in an argumentative tactic for cross-examination" that was "designed to inflame the passion and prejudice of the jury against [Dykes]."

We look at a trial as a whole to determine whether prosecutorial misconduct warrants a new trial. *See State v. Johnson*, 616 N.W.2d 720, 727-28 (Minn. 2000) (stating that courts consider a prosecutor's closing argument as a whole when determining whether misconduct occurred); *see also State v. Hoppe*, 641 N.W.2d 315, 321-22 (Minn. App. 2002) (holding that a new trial was warranted after considering all instances of prosecutorial misconduct), *review denied* (Minn. May 14, 2002). Dykes alleges both unobjected-to and objected-to misconduct. Because we review unobjected-to and objected-to misconduct under different standards, we address each category in turn.

## I.    Any objected-to misconduct was harmless.

When an objection is made at trial, we first determine whether the prosecutor engaged in misconduct, and, if so, we apply a "two-tiered harmless-error analysis." *State v. Jackson*, 773 N.W.2d 111, 121 (Minn. 2009). If the misconduct is unusually serious, we

decide whether it was harmless beyond a reasonable doubt. *Id*. If the misconduct is less serious, we consider whether it likely played a substantial part in influencing the jury's verdict. *Id.* The fact that an objection is sustained is not by itself evidence of prosecutorial misconduct. *State v. Steward*, 645 N.W.2d 115, 122 (Minn. 2002).

Defense counsel objected to four of the prosecutor's lines of inquiry. First, after asking why Dykes and A.P. had sexual intercourse in the bathroom, rather than the nearby bedroom, the prosecutor commented, "I guess when you've got this romantic setting, who would want to go into a bedroom." The prosecutor immediately withdrew the statement.

Second, while inquiring about how Dykes and A.P. initially started spending time together, the prosecutor began a question with "Wait. All right. I definitely get the sense that from what you're saying you've got this way with the ladies but—." The district court sustained defense counsel's objection. Third, defense counsel objected when the prosecutor referred to a screwdriver found in Dykes's backpack as a "self-defense weapon." The district court sustained the objection on the ground that the question mischaracterized the evidence.

Finally, at the conclusion of cross-examination, Dykes explained why his version of events had changed over time. He said he was nervous on the date of the offense because the police were pointing a gun at him, and he was just trying to please them. And he explained that his account changed because he had time to think while he was sitting in jail. The prosecutor concluded by stating, "I do have to admit you thought on it and you came up with something better. I have no further questions." Defense counsel moved to

strike the comment as argumentative. The district court agreed, immediately instructing the jurors to disregard the comment.

None of these alleged instances of misconduct are unusually serious. And even if they constitute less serious misconduct, we conclude they did not play a substantial part in influencing the jury's verdict. The first three objections relate to issues Dykes or his counsel raised. During direct examination, defense counsel asked Dykes why he and A.P. had intercourse in the bathroom. Dykes expressed admiration for women during his direct testimony, stating that he did not turn down A.P. even though he was dating her best friend "[b]ecause [he] love[s] women." And he testified on direct that he kept the screwdriver in his backpack for safety reasons. Because the objected-to questions and comments concerned evidence Dykes presented, any misconduct is not likely to have played a substantial role in the jury's verdict.

Moreover, the district court timely addressed each objection. And the court immediately instructed the jury to disregard the prosecutor's final statement. *See State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998) (stating that we assume the jury follows a district court's instructions). Finally, Dykes's allegations of misconduct do not overcome the strength of the evidence, as discussed below. In sum, Dykes is not entitled to a new trial based on objected-to prosecutorial misconduct.

## II. Unobjected-to misconduct did not affect Dykes's substantial rights.

Dykes asserts that the prosecutor made many argumentative and demeaning remarks during cross-examination that, when taken as a whole, deprived him of a fair trial. For example, Dykes argues that it was inappropriate for the prosecutor to preface questions

with the statements "let me understand this" and "let me get this straight." And he challenges the prosecutor's response to several of his answers with comments such as "wow" and "convenient."

We review unobjected-to prosecutorial misconduct under a modified plain-error standard, considering whether there is "(1) error, (2) that is plain, and (3) affects substantial rights." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). "If we conclude that any prong of the plain error analysis is not satisfied, we need not consider the other prongs." *State v. Brown*, 815 N.W.2d 609, 620 (Minn. 2012). The focus of our analysis is the third prong, in which the state bears the burden of proving that any misconduct did not affect the defendant's substantial rights. *Id.* When deciding whether the state has met this burden, we consider (1) the strength of the evidence against the defendant, (2) the pervasiveness of the misconduct, and (3) whether the defendant had the opportunity, or made efforts, to rebut the prosecutor's improper suggestions. *State v. Hill*, 801 N.W.2d 646, 654-55 (Minn. 2011).

As to the first factor, our review of the record shows that the case against Dykes was strong. While Dykes is correct that the case essentially boiled down to which version of events the jury believed, his account was marred by changing stories and inconsistent statements. *See State v. Jones*, 753 N.W.2d 677, 693 (Minn. 2008) (stating the defendant's credibility was "seriously undermined" by the inconsistent statements he made to the police). During his custodial interview, Dykes stated that he and A.P. had never been alone, and that on the date in question they engaged in consensual intercourse almost immediately after he arrived at the residence. He also said that A.P. was wearing pants

8

when he got to her house and that she did not kiss him at any point. At trial, Dykes testified that he and A.P. had been alone on three prior occasions, and that on the date in question they ate breakfast and watched television together before their sexual encounter. He also testified that she was not wearing pants at any point and kissed him during the encounter. In contrast, A.P.'s account of the incident was generally consistent throughout her interactions with the police, the sexual-assault examination, and her trial testimony. And her testimony was corroborated by other witnesses and the physical evidence of forceful penetration.

With respect to the pervasiveness factor, Dykes argues that the cross-examination was "saturated" with conduct and comments attempting to convey the prosecutor's disbelief in Dykes's testimony. We are not convinced that any misconduct was pervasive. We first note that the allegations of misconduct are limited to the prosecutor's cross-examination of Dykes; there is no claim of misconduct during opening statements, closing arguments, or the examination of other witnesses. We next observe that a prosecutor is not required to be impartial, particularly when cross-examining a defense witness. A prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones." *State v. Jones*, 277 Minn. 174, 188, 152 N.W.2d 67, 78 (1967) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935)). Courts allow a wide range of inquiry on cross-examination, particularly when "there is a sharp conflict in the evidence . . . [and] the credibility of the defendant and complainant are critical." *State v. McDaniel*, 534 N.W.2d 290, 293 (Minn. App. 1995), *review denied* (Minn. Sept. 20, 1995). Such is the case here. The prosecutor was entitled to and did vigorously cross-examine Dykes. It was not

9

improper to press Dykes on the myriad inconsistencies in his various accounts to law enforcement and his long and detailed trial testimony. *See id.* (noting "[t]he prosecutor is allowed to explore discrepancies in testimony"). Given the centrality of the credibility issue, the prosecutor acted properly within his role by attempting to discredit Dykes's testimony.

We agree with Dykes that it was improper for the prosecutor to respond to three of Dykes's answers with the word "wow." While it is possible that, as the state argues, the comment was a reflexive verbal tic, it simply has no place in cross-examination. But the prosecutor said "wow" three times during a 59-page cross-examination. We are not persuaded that these isolated comments were sufficiently pervasive to taint the otherwise proper cross-examination.

Finally, we are persuaded that Dykes had the opportunity, or made efforts, to rebut the prosecutor's challenged suggestions. *Hill*, 801 N.W.2d at 654-55. To the extent Dykes argues that the prosecutor was implicitly trying to communicate to the jury that his story was not credible, he had the opportunity to explain his version of events and why his accounts had changed over time. His own attorney questioned him extensively on the discrepancies in his accounts of the incident. During both direct and cross-examination, Dykes explained that he initially lied to the police because he was nervous, but decided to tell the truth after he realized that lying was not making the situation better. Defense counsel also responded during closing argument, asserting that Dykes had told the true story for the first time during his direct testimony, and that "[the prosecutor] couldn't shake [Dykes], couldn't get him upset, couldn't catch any inconsistencies." Not only did defense

counsel rebut the prosecutor's allegedly improper cross-examination, he actually used it to argue that Dykes's trial testimony was credible.

On this record, we conclude that unobjected-to misconduct did not affect Dykes's substantial rights and that he is not entitled to a new trial.

**Affirmed.**