STATE OF MINNESOTA

IN SUPREME COURT

A22-0163

Hennepin County                                                      Moore, III, J.

Concurring in part, dissenting in part, Thissen, Anderson, JJ.

Took no part, Procaccini, J.

State of Minnesota,

        Respondent,

vs.                                              Filed: January 31, 2024

                                                  Office of Appellate Courts

Elsa E. Segura,

        Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     Although the State presented sufficient circumstantial evidence to sustain defendant's convictions for both first-degree felony murder while committing a kidnapping and kidnapping to commit great bodily harm or terrorize, under an aiding-and-abetting

theory of liability, it failed to present sufficient evidence to sustain defendant's convictions for first-degree premeditated murder and attempted first-degree premeditated murder, under an aiding-and-abetting theory of criminal liability.

2. Defendant is not entitled to a new trial based on her unobjected-to claim of prosecutorial misconduct because the State proved that any error committed by the prosecutor did not affect defendant's substantial rights.

3. Although the district court did not abuse its discretion by denying defendant's proposed jury instructions, the district court abused its discretion by giving erroneous jury instructions on accomplice liability, and the error was not harmless because it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict.

4. The district court did not err by allowing the State to elicit testimony from defendant related to her proffer statements because defendant waived the evidentiary protections of Minnesota Rule of Evidence 410, and the statements were properly admitted as impeachment evidence.

Reversed and remanded.

O P I N I O N

MOORE, III, Justice.

Appellant Elsa Segura appeals her convictions for first-degree premeditated murder, attempted first-degree premeditated murder, first-degree intentional murder while committing a felony (kidnapping), and kidnapping to commit great bodily harm or terrorize, all premised on aiding-and-abetting theories of criminal liability. Segura argues

2

that the State presented insufficient evidence to sustain her convictions under aiding-and-abetting theories of criminal liability. She further contends that the prosecutor committed reversible error during closing argument by urging the jury to find her guilty based on a theory that she believed she was aiding a drug business. Segura also challenges the district court's jury instructions on several grounds. Finally, she argues that the district court admitted evidence in violation of Minnesota Rule of Evidence 410 by allowing the State to elicit testimony from her regarding her proffer statements.

We conclude that although there is sufficient evidence to sustain Segura's convictions for kidnapping to commit great bodily harm or terrorize and first-degree intentional murder while committing a felony (kidnapping) under aiding-and-abetting theories of liability, there is insufficient evidence to sustain her convictions for first-degree premeditated murder and attempted first-degree premeditated murder under aiding-and-abetting theories of liability. We also conclude that the State established that the alleged prosecutorial misconduct—which was unobjected to at trial—did not affect Segura's substantial rights. We further conclude that the district court abused its discretion by giving erroneous jury instructions, and that these instructions were not harmless beyond a reasonable doubt. Finally, we determine that the district court did not err in admitting evidence related to Segura's proffer statements. Consequently, we reverse all of Segura's convictions and remand for further proceedings consistent with this opinion on the kidnapping and felony murder charges.

**FACTS**

This case arises from the fatal shooting of Monique Baugh and the nonfatal shooting of her boyfriend, J.M.-M. On December 31, 2019, Segura, posing as an interested home buyer at the direction of her boyfriend Lyndon Wiggins, lured realtor Baugh to a sham house showing in Maple Grove. Using a fictitious name, Segura scheduled a showing of a home through multiple phone calls with Baugh as instructed by Wiggins. Segura never appeared at the "showing," but Wiggins's accomplices Cedric Berry and Berry Davis did. After Baugh arrived at the home in Maple Grove, Berry and Davis bound Baugh's hands and neck with duct tape and forced Baugh into the cargo area of a rented U-Haul van. After about 2 ½ hours, the men eventually drove to Baugh's home in Minneapolis, where J.M.-M. was watching the couple's two children, and shot J.M.-M. several times. Berry and Davis later shot Baugh in an alley in Minneapolis. J.M.-M. survived his injuries, but Baugh died from her gunshot wounds.[1]

The State's theory was that Berry and Davis committed these crimes at the direction of Wiggins, a man who worked for a music company with which J.M.-M. had a recording contract. Wiggins was also a trafficker of illegal drugs and had connections to Berry and Davis. In early 2019, Wiggins and J.M.-M. had a falling-out over a dispute involving the

---

[1] The details of the underlying crimes are discussed in more detail in Berry's and Davis's direct appeals. *See State v. Berry*, 982 N.W.2d 746, 750–54 (Minn. 2022); *State v. Davis*, 982 N.W.2d 716, 721–22 (Minn. 2022). Both Berry and Davis were found guilty by the jury of first-degree premeditated murder, attempted first-degree premeditated murder, first-degree felony murder, and kidnapping. We affirmed their convictions for first-degree premeditated murder, attempted first-degree premeditated murder, and kidnapping on direct appeal. *Berry*, 982 N.W.2d at 761; *Davis*, 982 N.W.2d at 729.

record label. Around that time, Wiggins texted a contact that he "damn near caught a murder case" after unexpectedly seeing J.M.-M. Later that year, Wiggins was arrested on drug charges, and he believed that J.M.-M. was a "snitch" for having provided information to the police and was therefore responsible for his arrest. Accordingly, the State theorized, Wiggins directed Berry and Davis to commit the kidnapping, murder, and attempted murder to take revenge on J.M.-M.

The State also alleged that Segura, who had been in a romantic relationship with Wiggins for around 3 years and had admitted to scheduling the house showing from which Baugh was kidnapped, was liable for these crimes as an accomplice. A grand jury indicted Segura with first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2022); kidnapping to commit great bodily harm or terrorize, Minn. Stat. § 609.25, subd. 1(3) (2022); and first-degree intentional murder while committing a felony (kidnapping), Minn. Stat. § 609.185(a)(3) (2022), for conduct involving Baugh. The grand jury also indicted Segura with attempted first-degree premeditated murder, Minn. Stat. § 609.17 (2022); *see* Minn. Stat. 609.185(a)(1) (2022), in connection with conduct involving J.M.-M. All of the counts alleged aiding-and-abetting theories of criminal liability. Minn. Stat. § 609.05 (2022). Segura pleaded not guilty and demanded a jury trial.

The evidence at trial showed that Segura began dating Wiggins in 2016 and that shortly after the beginning of their relationship, she researched Wiggins's criminal history. Segura had access to such information through her job as a probation officer. She learned that Wiggins had been convicted of aggravated robbery and that he was required to register as a predatory offender because there was, as she described it, a "kidnapping component"

5

to the robbery. In looking up the details of this aggravated robbery, Segura learned that Wiggins and accomplices had forced a victim into the trunk of a car.[2]

In 2017, Segura learned that Wiggins was involved in illicit drug manufacturing and distribution. Over the course of their relationship, she assisted Wiggins in many ways, including renting a condominium for him, leasing a truck for him, buying pill presses for his drug trafficking business, and booking flights, bus tickets, hotel rooms, and Uber and Lyft rides for him. Segura always used her own name, contact information, and financial information.

Segura knew that J.M.-M. was a recording artist who worked for the same record label as Wiggins. J.M.-M. had been to Segura's home—where Wiggins had set up a recording studio—several times, and both Segura and J.M.-M. had attended parties hosted by Wiggins. J.M.-M. testified that people who knew both him and Wiggins would know that he was dating Baugh. He also testified that there were two parties that both Segura and Baugh attended and that Segura followed him on Instagram, where he posted about Baugh and their children. Based on text messages sent to her from Wiggins, Segura knew that J.M.-M. and Wiggins had a falling-out related to the record label. And when Wiggins was arrested on drug charges in October 2019, he called Segura from jail and told her that J.M.-M. was a snitch.

_____

[2] On cross-examination, Segura conceded that aggravated robberies often involve violence and that as a probation officer, she had clients who had been convicted of aggravated robbery with a firearm.

6

On December 29, 2019, 2 days before the kidnapping and shootings, Segura met Wiggins after work, and he showed her a real estate listing. He said that he wanted Segura to call the realtor and set up a house showing but told her to wait to make the call. Cell-site location information (CSLI) revealed that Berry, Davis, and Wiggins were in the vicinity of a cell phone store in North Minneapolis later that day.[3] Video evidence from the store showed Berry entering to purchase and activate the phone with a number ending in 2101 that Segura later used to schedule the sham house showing with Baugh (the set-up phone). Berry initially gave the name "Lisa Prescott" for the account associated with the set-up phone. However, after a phone call with Davis, Berry changed the name associated with the set-up phone to "Lisa Pawloski." While Berry was purchasing the set-up phone, Wiggins and Segura were in contact via a 19-second Facetime call.

Cell-site location information (CSLI) showed that Wiggins, Berry, and Davis—along with the newly purchased set-up phone—traveled from the cell phone store to the area of Segura's home. All four phones remained in the area of Segura's home for about half an hour. Segura testified that Wiggins entered her home and wrote down information related to the house listing he mentioned to her earlier. The information included the

---

[3]    "CSLI refers to the data collected as a cell phone connects to nearby towers. CSLI from towers can be used to approximate the cell phone's location using triangulation—an analysis of the phone's location based on the towers to which it connected." *Berry*, 982 N.W.2d at 751 n.2 (citations omitted).

address of the house, a phone number,[4] and "Monique"[5] as the name of the realtor she should call. Wiggins gave Segura the set-up phone to make the call, and he told her to use the name "Lisa Pawloski" and schedule a house showing for the next day. Wiggins also instructed her to call "Monique" from a place other than her house and to burn the piece of paper with the information and wash it down the sink once she was finished making the call. Segura admitted that this request from Wiggins was unlike anything else she had done for him in the past.

A little after 5 p.m., Segura drove to a mall parking lot, where she used the set-up phone to call "Monique." Segura left a voicemail introducing herself as "Lisa Pawloski" and asking to set up a house showing for the Maple Grove address Wiggins had given her. Five minutes later, Baugh called back and asked "Lisa Pawloski" to text her to schedule the house showing. While Segura was driving back to her home, she was in contact with Wiggins by phone.

CSLI placed the phones of Segura, Berry, and Davis in the vicinity of Segura's home from 5:53 to 5:58 p.m. Segura then drove back to the mall, where she used the set-up phone to exchange text messages with "Monique" to set the time for the house showing the next day. Once the appointment was scheduled, Segura turned off the set-up phone and drove back to her home. Segura once again called Wiggins.

---

[4]     The phone number was Baugh's cell phone number.

[5]     "Monique" was Monique Baugh. Segura testified that, at the time she made the calls, she was unaware that "Monique" was, in fact, Baugh.

Later that night, Wiggins went to Segura's home. He advised her to stay away from her home during the time of the house showing the next day and to leave her personal cell phone at home. Segura, who was aware of the significance of cell phone data mapping, admitted that Wiggins likely instructed her to do this because of the possibility of law enforcement using cell phone data to determine her location. He told Segura to call "Monique" in the morning to confirm the appointment. Additionally, Wiggins instructed her to call "Monique" again at the time of the appointment, say that she was running late, and ask whether the stove in the house was gas or electric.

Meanwhile, Berry and Davis met with another individual, K.W., and asked him to rent the smallest available U-Haul truck that same day. K.W. agreed to rent the U-Haul but explained that he could not rent it until December 30. Around 9:30 p.m. that night, CSLI placed Wiggins, Berry, and Davis together. Video evidence showed Davis purchasing bleach, ammonia, two-way radios, and a canvas tent from a store in the vicinity of the CSLI location associated with the three men.

The next morning, Segura followed Wiggins's instructions, confirming the house showing with "Monique" and then calling at the time of the appointment to say she was running late.[6] After making these calls, Segura returned home, where she saw missed calls

---

[6] Baugh had arrived at the Maple Grove house at about 11 a.m., the scheduled time for the showing. Another real estate agent, who also had an appointment to show the house at the same time, chatted with Baugh while they were waiting for their prospective clients to arrive. Baugh received the call from "Lisa Pawloski" in which she asked Baugh whether the stove was gas or electric. Baugh commented to the other agent that the call was odd and that she wondered how the prospective client had gotten her personal phone number. "Lisa Pawloski" never arrived at the house for the showing.

9

on her personal phone from Wiggins. Wiggins later arrived at Segura's home and instructed her to call "Monique" to reschedule the house showing for the next day.

Once again, Segura left her home and called "Monique," but the realtor did not answer the call. Segura then sent "Monique" text messages asking to reschedule the showing for the next day. After driving home and remaining there for a few hours, Segura left her home to check the set-up phone. The realtor had texted her back and suggested a 3 p.m. appointment, which Segura accepted. Segura relayed this information to Wiggins when he was at her home later that night. K.W.'s wife rented the U-Haul truck at 8:12 p.m. that night.

The next morning, Segura left her home and texted "Monique" from the set-up phone to confirm the 3 p.m. house showing. At around 11:40 a.m., Davis and Berry picked up the U-Haul truck from the parking lot where K.W. left it. At that same time, Wiggins called Segura and spoke to her for over 2 minutes. At around 2 p.m., Wiggins came to Segura's home and took the set-up phone. He stayed there for about half an hour. Phone records showed that while with Wiggins, Segura searched "Death Row Records," a record label she acknowledged is known for representing artists who killed people and whose founder is in prison for murder. Shortly after 3 p.m., Berry and Davis kidnapped Baugh from the Maple Grove house where she was lured by Segura's request for a sham showing and forced into the cargo area of the U-Haul truck. After driving with Baugh bound by duct tape for nearly two hours, at about 5:16 p.m. the U-Haul truck was observed circling around the block near Baugh's house.

At about 5:40 p.m., Berry and Davis used Baugh's key to enter her residence where they encountered and shot J.M.-M., leaving him bleeding on an upstairs bedroom floor. About an hour later, while still being held hostage by Berry and Davis, Baugh was fatally shot in the face and chest with the same handgun used to shoot J.M.-M. and her body was left in an alley. Baugh's body was found with blood on it, one of her teeth had been broken, her hands and neck Had been bound with duct tape, and several of her acrylic nails had been ripped from her fingers. When K.W. and his wife returned the U-Haul truck, it smelled strongly of bleach and ammonia. Later forensic testing on an acrylic fingernail and blood found in the U-Haul truck revealed the presence of a major DNA profile that matched Baugh's DNA.

That evening, Segura worked a shift at the Juvenile Supervision Center from 6 p.m. to 10 p.m.[7] While at work, Segura searched the Hennepin County jail roster. Her phone records revealed that she made searches relating to stress and anxiety. After work, she and Wiggins spoke on the phone. Most other calls between the two in the days leading to Baugh's kidnapping and the shootings were less than 5 minutes long, but this call lasted for more than 10 minutes.

On January 1, 2020, the day after the kidnapping and shootings, Segura read local news articles about Baugh's death. She and Wiggins exchanged multiple calls that day. During a FaceTime call with Wiggins, Segura saved a photo of Baugh to her phone. In the

---

[7]     In addition to her job as a probation officer, Segura also worked part time at the Juvenile Supervision Center.

11

days that followed, Segura read more articles about Baugh's death, including one article that reported the arrest of a suspect. She saved more photos of Baugh to her phone, exchanged calls with Wiggins, and again searched the Hennepin County jail roster. Her phone records revealed that in the days before she was arrested, Segura's internet searches included the sacrament of confession, the topic of legal immunity, and the term "incinerator." The set-up phone Segura used to lure Baugh to her abduction and eventual murder was never located by law enforcement. Investigators spoke to Segura as part of their investigation into the crimes. She was later charged, had a proffer meeting[8] with prosecutors, and proceeded to a jury trial.

At trial, Segura testified in her own defense. Although she admitted to using the phone given to her by Wiggins to schedule the Maple Grove house showing, she denied having knowledge of any plan to kidnap Baugh and shoot Baugh and J.M.-M. According to Segura, she initially thought she was helping Wiggins with his drug business. On cross-

---

[8] As one federal circuit court has explained:

> A "proffer agreement" is generally understood to be an agreement between a defendant and the government in a criminal case that sets forth the terms under which the defendant will provide information to the government during an interview, commonly referred to as a "proffer session." The proffer agreement defines the obligations of the parties and is intended to protect the defendant against the use of his or her statements, particularly in those situations in which the defendant has revealed incriminating information and the proffer session does not mature into a plea agreement or other form of cooperation agreement.

*United States v. Lopez,* 219 F.3d 343, 345 n.1 (4th Cir. 2000). In this case, after Segura was charged, she met with law enforcement and prosecutors from the Hennepin County Attorney's Office to provide information relating to the kidnapping and murder of Baugh and the attempted murder of J.M.-M.

examination, the State impeached Segura's testimony with statements she had made during the proffer meeting before trial. During this cross-examination, Segura admitted to lying to investigators when she claimed she was "just friends" with Wiggins in an effort to distance herself from him. Segura also admitted to lying to investigators that she was home when she made the phone calls to Baugh and also by initially telling officers that she did not know who Baugh was. Segura agreed when investigators asked if she knew something bad was going to happen to Baugh, but at trial continued to assert she believed they were only planning something "in relation to the drug business." Segura never testified, however, that she thought Wiggins planned to rob Baugh.

Following the close of evidence, the district court instructed the jury on the substantive offenses with which Segura was charged and provided accomplice liability instructions for each count. The district court rejected the accomplice liability instructions that Segura had proposed, and Segura objected to the instructions selected by the district court. During closing arguments, the parties focused on whether the State proved Segura's liability as an accomplice who "intentionally aid[ed]" in the commission of the crimes committed by Berry and Davis. *See* Minn. Stat. § 609.05, subd. 1.

The jury found Segura guilty as charged. The district court sentenced her to two concurrent sentences of 200 months in prison for kidnapping to commit great bodily harm or terrorize and attempted first-degree murder and a consecutive sentence of life in prison

13

without the possibility of release for first-degree premeditated murder.[9] On direct appeal, Segura makes several arguments regarding the sufficiency of the evidence to support her convictions, the prosecutor's statements during closing argument, the jury instructions, and the use of her proffer statements at trial. We address each argument in turn.

**ANALYSIS**

**I.**

Segura first argues that the State presented insufficient evidence to sustain her convictions. The test we use to evaluate the sufficiency of the evidence depends on whether the State relied on direct or circumstantial evidence at trial. When reviewing the sufficiency of direct evidence, "we painstakingly review the record to determine whether that evidence, viewed in the light most favorable to the verdict, was sufficient to permit the jurors to reach the verdict that they did." *State v. Hassan*, 977 N.W.2d 633, 639–40 (Minn. 2022).

But when a conviction is based on circumstantial evidence, as Segura's convictions are here, we use a heightened two-step process to review the sufficiency of the evidence. *Id.* at 640. The first step is to "identify the circumstances proved." *Id.* In doing so, we winnow down the evidence presented at trial to a subset of facts that are consistent with the jury's verdict, and we disregard all evidence that is inconsistent with the verdict. *Id.* The second step is to "identify the reasonable inferences that can be drawn from the

---

[9] Although the jury convicted Segura of first-degree felony murder, the district court did not enter an adjudication nor sentence Segura for this offense because it is a lesser included offense of first-degree premeditated murder.

14

circumstances proved when viewed 'as a whole and not as discrete and isolated facts.' " *Id.* (quoting *State v. Cox*, 884 N.W.2d 400, 412 (Minn. 2016)). We give no deference to the jury's choice between reasonable inferences. *Id.* "The State's circumstantial evidence is sufficient when the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.*

Here, the jury found Segura guilty of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1); kidnapping to commit great bodily harm or terrorize, Minn. Stat. § 609.25, subd. 1(3); first-degree intentional murder while committing a felony (kidnapping), Minn. Stat. § 609.185(a)(3); and attempted first-degree premeditated murder, Minn. Stat. § 609.17; *see* Minn. Stat. § 609.185(a)(1). The State alleged Segura was guilty of these crimes—all of which were indisputably committed by others—under aiding-and-abetting theories of liability. We begin by reviewing our law on aiding-and-abetting liability.

A defendant may be held criminally liable for the acts of others under Minnesota's aiding-and-abetting statute. Minn. Stat. § 609.05. "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." *Id.*, subd. 1. If a person is liable as an accomplice for a crime under Minn. Stat. § 609.05, subd. 1, the person is "also liable for any other crime committed in pursuance of the intended crime If reasonably foreseeable by the person as a probable consequence of committing or

15

attempting to commit the crime intended."[10]  *Id.*, subd. 2.  Aiding and abetting is not a separate substantive offense.  *State v. DeVerney*, 592 N.W.2d 837, 846 (Minn. 1999). Rather, it is "a theory of criminal liability."  *Dobbins v. State*, 788 N.W.2d 719, 729–30 (Minn. 2010).  Thus, "section 609.05 makes accomplices criminally liable as principals." *State v. Ezeka*, 946 N.W.2d 393, 407 (Minn. 2020).

The "intentionally aids" element requires that the defendant "knew that [her] alleged accomplices were going to commit a crime" and that the defendant "intended [her] presence or actions to further the commission of that crime."  *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007); *see* Minn. Stat. § 609.05.  The requisite state of mind for accomplice liability can be inferred from circumstantial evidence, including the "defendant[']s presence at the scene of the crime, [a] close association with the principal before and after the crime, [a] lack of objection or surprise under the circumstances, and defendant[']s flight from the scene of the crime with the principal."  *State v. Hawes*, 801 N.W.2d 659, 668 (Minn. 2011) (internal quotation marks omitted) (quoting *State v. Swanson*, 707 N.W.2d 645, 659 (Minn. 2006)).

Segura concedes that the State "proved beyond a reasonable doubt that Wiggins, Davis, and Berry conspired to commit kidnapping and murder and that Davis and Berry kidnapped and killed Baugh and tried to kill [J.M.-M.]."  To be clear, Segura does not claim that Wiggins, Davis, and Berry conspired to rob Baugh, which is not surprising because

---

[10]  "We commonly use the word 'principal' when referring to the person who committed the crime and the word 'accomplice' when referring to the person who intentionally aided the principal's commission of the offense."  *State v. Ezeka*, 946 N.W.2d 393, 407 (Minn. 2020).

16

unlike kidnapping, robberies of an individual do not typically require a U-Haul truck, ammonia, or bleach. Instead, her argument that the State presented insufficient evidence to convict her of aiding and abetting these offenses centers on the "intentionally aids" element of accomplice liability. She concedes that her communications with Baugh to schedule the sham house showing furthered the commission of the kidnapping and murder of Baugh and the attempted premeditated murder of J.M.-M. But she asserts that the State failed to prove that she knew of the kidnapping-murder plot or that she intended her actions to aid in the commission of those crimes. She contends that the circumstances proved do not exclude a rational hypothesis consistent with her innocence: specifically, that she believed she was helping Wiggins with his drug business.

A.

We begin our analysis by identifying the circumstances proved. *Hassan*, 977 N.W.2d at 640. It is undisputed that on December 31, 2019, Segura lured Baugh to a sham house showing in Maple Grove, where the principals, Berry and Davis, kidnapped Baugh, transported Baugh to her home where they shot her boyfriend, and then drove Baugh to an alley in Minneapolis and fatally shot her. It is also undisputed that Berry and Davis planned and executed these crimes with the help of Wiggins, who had a falling-out with J.M.-M. and believed that J.M.-M. was responsible for Wiggins's arrest on drug charges in October 2019.

The central issue is what Segura *knew* when she scheduled the house showing with Baugh. The circumstances proved include the following facts. Segura had been dating Wiggins for several years and knew his criminal history included an aggravated robbery

17

that involved a kidnapping. She also knew he had a falling-out with J.M.-M. Segura followed J.M.-M. on social media and saw posts about Baugh. Moreover, people who knew Wiggins and J.M.-M. (such as Segura) would know that Baugh and J.M.-M. were dating.

Two days before the kidnapping and shootings—shortly after purchasing the set-up phone—Wiggins, Berry, and Davis were in the area of Segura's home. Later that day, the three men were again in the vicinity of Segura's home before they purchased items used in the kidnapping-murder plot. Wiggins's instructions to Segura to schedule a house showing were unlike other requests Wiggins had made of Segura in the past. He told Segura to call the realtor using a particular phone he provided, to use a fake name, to leave her house when calling the realtor, and then to burn the piece of paper with the information and wash it down the sink once she was finished making the call. Segura knew the realtor she was calling was named "Monique." Segura followed J.M.-M. on Instagram, where he posted about Baugh and their children. Wiggins and Segura were in communication with each other at the key points in the kidnapping-murder conspiracy, including when the set-up phone was purchased, after each call Segura made to Baugh, and when Berry and Davis picked up the U-Haul truck.

B.

In identifying the reasonable inferences that can be drawn from the circumstances proved, "we view the circumstances proved as a whole and not as discrete and isolated facts." *State v. Cox*, 884 N.W.2d 400, 412 (Minn. 2016). The State's circumstantial evidence is sufficient when the reasonable inferences are consistent with the hypothesis

18

that the accused is guilty and inconsistent with any rational hypothesis other than guilt. *Id.* Put differently, if the circumstances proved, when viewed as a whole, are consistent with a reasonable inference of innocence, the State's circumstantial evidence is not sufficient to support the conviction. *State v. Alarcon*, 932 N.W.2d 641, 649–50 (Minn. 2019); *State v. Harris*, 895 N.W.2d 592, 603 (Minn. 2017).

We start by considering whether the circumstances proved support a reasonable inference that Segura knew that Wiggins, Berry, and Davis planned to kidnap Baugh and murder Baugh and J.M.-M. When the circumstances proved are viewed was a whole, they support the following reasonable inferences. Segura knew that Wiggins intended to commit *some* sort of illicit activity different from his past illegal drug-related business, and that her actions of calling and texting Baugh furthered that illicit activity. Segura knew of Wiggins's motive to get back at J.M.-M. Segura knew Baugh and J.M.-M. were dating. Wiggins, Berry, and Davis were at Segura's home two days before the crimes were committed. While in Segura's presence, the three men made their plans to kidnap Baugh from a sham real estate showing using a U-Haul truck and force her to lead them to J.M.-M. so they could kill him and then kill Baugh to conceal their crimes.

When the circumstances proved are viewed a whole, one could reasonably infer that Segura knew of the plan to kidnap Baugh and murder Baugh and her boyfriend when Segura scheduled the sham house showing, and that Segura intended her contacts with Baugh to further this plan. Thus, the circumstances proved support a reasonable inference that Segura is guilty of the kidnapping and premeditated murder of Baugh and the

19

attempted premeditated murder of J.M.-M. under aiding-and-abetting theories of criminal liability.

Because the circumstances proved support the inference that Segura intentionally aided the kidnapping of Baugh, we conclude that the circumstances proved are also consistent with Segura's guilt of felony murder while committing a kidnapping. A person is guilty of felony murder when they "cause[] the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit . . . kidnapping." Minn. Stat. § 609.185(a)(3). There is no dispute that Berry and Davis intentionally caused the death of Baugh while kidnapping her. Segura is liable for felony murder under an aiding-and-abetting theory if she "intentionally aid[ed]" the commission of a crime or if the commission of that crime was "reasonably foreseeable" to Segura "as a probable consequence of" another crime she intentionally aided—namely, the kidnapping of Baugh. Minn. Stat. § 609.05, subds. 1–2. Murder can be a foreseeable consequence of kidnapping.[11] *See State v. Berrisford*, 361 N.W.2d 846, 851 (Minn. 1985). The foreseeability to Segura that the kidnapping in this case would lead to Baugh's death is

---

[11]      Other jurisdictions' articulations of felony murder support the inference that murder is often a foreseeable consequence of kidnapping. *See Commonwealth v. Bolish*, 113 A.2d 464, 475 (Pa. 1955) (explaining that, under the doctrine of felony murder, "[i]f the original malicious act was arson, rape, robbery, burglary or kidnapping, the original actor is guilty of murder in the first degree"), *overruled on other grounds by Commonwealth ex rel. Shadd v. Myers*, 223 A.2d 296 (Pa. 1966); Me. Rev. Stat. tit. 17-A, § 202(1) (2022) (stating that a person is guilty of felony murder if, after committing or attempting to commit kidnapping, the person "in fact causes the death of a human being, and the death is a reasonably foreseeable consequence of such commission, attempt or flight"); *State v. Anderson*, 409 A.2d 1290, 1306 (Me. 1979) ("The Legislature was aware that the crime of murder is, more often than not, committed in the course of robberies, burglaries, kidnappings, arsons, rapes and gross sexual misconduct cases . . . .").

20

supported by the fact that Segura knew of Wiggins's past conviction of a violent crime. Thus, the circumstances proved are consistent with Segura's guilt of felony murder.

We turn to the next step of our circumstantial evidence standard, which requires us to consider whether the circumstances proved, when viewed as a whole, are consistent with "any rational hypothesis other than guilt." *State v. McInnis*, 962 N.W.2d 874, 890 (Minn. 2021) (internal quotation marks omitted) (quoting *State v. Peterson*, 910 N.W.2d 1, 7 (Minn. 2018)). The circumstances proved, as a whole, need not exclude all inferences other than guilt because "[t]he State's obligation is to exclude all *reasonable* inferences other than guilt." *State v. Tscheu*, 758 N.W.2d 849, 857 (Minn. 2008). A defendant "may not rely on mere conjecture" to argue that the circumstances proved, as a whole, are consistent with a reasonable hypothesis of her innocence. *Id.* at 858. The defendant "must instead point to evidence in the record that is consistent with a rational theory other than guilt." *Id.* The absence of evidence in the record regarding certain circumstances does not constitute a circumstance proved from which reasonable inferences may be drawn. *McInnis*, 962 N.W.2d at 891 n.6.

Segura contends that it is reasonable to infer from the circumstances proved, as a whole, that she believed she was assisting Wiggins's illegal drug trafficking activities, as opposed to kidnapping-murder, by calling "Monique." We disagree that it is reasonable to infer that Segura believed she was merely aiding Wiggins's illicit drug activities when she called the realtor. The circumstances proved, as a whole, make it clear that Wiggins's plans were different—and more serious—than the drug trafficking Segura knew Wiggins was involved in. Wiggins told Segura to call "Monique" using a fake name, whereas she had

21

previously done things for Wiggins using her own name and her own financial information. Moreover, Segura followed Wiggins's instruction to make the calls and texts from places other than her house, which shows she did not want the set-up phone being traced to her home.

But we conclude that the circumstances proved, as a whole, support a reasonable inference that Segura believed the end goal of Wiggins's plan was some crime less serious than the premeditated murder of Baugh and J.M.-M. Again, Segura knew of Wiggins's animosity toward J.M.-M., his motivation for revenge, and his violent history. It is reasonable to infer that Wiggins's plan could include murder. But it also could have included a kidnapping of Baugh followed by a serious assault on J.M.-M. Moreover, the circumstances proved in this case do not inescapably lead to the conclusion that Wiggins, Berry, and Davis originally planned to kill Baugh after kidnapping her and locating her boyfriend.[12] If Baugh's murder was not part of the original plan, then Segura could not have known of and intended to further a plan to murder Baugh when Segura set up the sham house showing. The circumstances proved, when viewed as a whole, do not rule out these reasonable possibilities. Therefore, we conclude that there is a reasonable hypothesis of Segura's innocence of the premeditated murder of Baugh and the attempted premeditated murder of J.M.-M.

---

[12]    The State itself appeared to concede this point at trial. In closing argument, while summarizing the State's evidence, the prosecutor acknowledged that "[k]illing Monique Baugh probably wasn't the original plan" and that "Monique Baugh was a means to an end, the end being locating and probably killing [J.M.-M.]."

Nevertheless, we conclude that there is no reasonable hypothesis of Segura's innocence of the kidnapping and felony murder of Baugh while committing a kidnapping. When she set up the house showing with Baugh, Segura knowingly carried out Wiggins's instructions to isolate Baugh in an untraceable way—by using a set-up phone provided by Wiggins, scheduling the appointment with a fake name, and never making calls at or near her residence. These suspicious circumstances unquestionably lead to the conclusion that this was not a normal house showing. This scheme to isolate Baugh—along with Segura's knowledge of Wiggins's past criminal history—leads us to conclude that when viewed as a whole, the circumstances proved do not support a reasonable inference that Segura believed she was aiding a crime other than kidnapping.

Moreover, considering this scheme, we conclude that it is unreasonable to infer that the possibility of murder was unforeseeable to Segura. *See* Minn. Stat. § 609.05, subd. 2. Therefore, the circumstances proved do not support an inference of innocence for the kidnapping and felony murder convictions.

We disagree with the dissent that the circumstances proved, when viewed as a whole, support a reasonable inference that Segura believed Wiggins planned to rob, but not kidnap, the realtor she called. Segura concedes that the State proved beyond a reasonable doubt that Wiggins, Davis, and Berry conspired to kidnap Baugh. And there are two reasons to reject the dissent's alternative theory that Segura believed the conspiracy's goal was robbery. First, unlike a kidnapping, a robbery of someone's person does not typically

23

require the use of a U-Haul truck to conceal the victim,[13] or of ammonia or bleach.[14] Second, the grand jury indictments against Wiggins, Davis, and Berry do not allege a conspiracy to rob Baugh. Moreover, nothing in the record suggests that during Wiggins's communications with Segura at the key points in the kidnapping-murder conspiracy, Wiggins said or did anything to suggest he was conspiring with Davis and Berry to simply rob Baugh. Instead, the timing of those communications support a reasonable inference that Segura knew that as part of the preparation for the offense, a U-Haul truck and bleach were obtained. Because a jury's verdict may not be set aside based on mere conjecture, *see Tscheu*, 758 N.W.2d at 858, we find the analysis of the dissent unpersuasive.

In sum, we conclude that the State presented insufficient evidence to sustain Segura's convictions for first-degree premeditated murder and attempted first-degree premeditated murder, under an aiding-and-abetting theory of liability. Therefore, these convictions must be reversed. But because we conclude that there is sufficient evidence to

---

[13] The dissent's theory is only that there is a reasonable inference that Wiggins, Davis, and Berry intended to rob Baugh personally, rather than rob the house Baugh was showing. A U-Haul is typically not needed to rob someone's person.

[14] Bleach, for example, is commonly used to cover up DNA evidence left at the crime scene. *See, e.g.*, *Crain v. State*, 894 So.2d 59, 73–76 (Fla. 2004) (finding sufficient evidence to show that defendant murdered victim during a kidnapping to facilitate an assault and observing that "the presence of bleach" in defendant's bathroom made it "impossible to tell how much of the luminol 'glow'—if any—was attributable to blood"); *State v. Davidson*, 509 S.W.3d 156, 220-21 (Tenn. 2016) (finding that bleach was sprayed into victim's mouth in an attempt to destroy evidence of perpetrator's DNA); *Bates v. State*, 750 S.E.2d 323, 326 (Ga. 2013) (finding circumstantial evidence sufficient to support murder conviction without DNA evidence, in part, because a bottle of bleach and bucket of bleach water were found in defendant's apartment, and forensic expert testified that "washing hands and cleaning with bleach destroys any DNA").

24

sustain, under an aiding-and-abetting theory, Segura's convictions for kidnapping to commit great bodily harm or terrorize and felony murder while committing a kidnapping, we must consider Segura's remaining arguments.

## II.

Segura contends that she is entitled to a new trial because the State, in closing argument, improperly urged the jury to find her guilty on the theory that she aided a drug business—a crime for which Segura was not indicted. Segura did not object to the prosecutor's statements at trial.

"When a defendant fails to object at trial, the forfeiture doctrine generally precludes appellate relief." *State v. Lilienthal*, 889 N.W.2d 780, 784–85 (Minn. 2017). The forfeiture doctrine plays a vital role in the criminal justice system because it encourages defendants to object while before the district court so that "any errors can be corrected before their full impact is realized." *State v. Beaulieu*, 859 N.W.2d 275, 279 (Minn. 2015) (citation omitted) (internal quotation marks omitted). But because a rigid and undeviating application of the forfeiture doctrine would be out of harmony with the rules of fundamental justice, Minn. R. Civ. App. P. 31.02 provides appellate courts "a limited power to correct errors that were forfeited." *Beaulieu*, 859 N.W.2d at 279 (citation omitted) (internal quotation marks omitted). This limited power is known as the plain-error doctrine. *Id*.

Our application of the plain error doctrine is modified when we review unobjected-to claims of prosecutorial misconduct. *State v. Jackson*, 773 N.W.2d 111, 121 (Minn. 2009). First, "[t]he defendant must prove an error was made that was plain." *Id.* An error

is plain if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). Prosecutors err when they misstate the law in closing argument. *State v. Strommen*, 648 N.W.2d 681, 689–90 (Minn. 2002).

If the defendant establishes an error that is plain, then "the burden shifts to the prosecution to demonstrate that the error did not affect substantial rights." *Jackson*, 773 N.W.2d at 121. "An error affects a defendant's substantial rights only if there is a reasonable probability that the error actually impacted the verdict." *Id.* Thus, "the State must show that there is 'no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict.' " *State v. Peltier*, 874 N.W.2d 792, 803–04 (Minn. 2016) (quoting *Ramey*, 721 N.W.2d at 302). We may correct a plain error that affects a defendant's substantial rights "only if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 804 (citation omitted) (internal quotation marks omitted).

While describing the legal standard to find Segura guilty of kidnapping, murder, and attempted murder under an aiding-and-abetting theory of criminal liability in closing argument, the prosecutor stated:

> Aiding and abetting can be a complicated legal concept. . . . Even if [Segura] didn't physically participate in the kidnapping, murder, and attempted murder here, *she is guilty if she knew another person was going to commit or was committing a crime, and if she acted to aid the other person*, so if she knew there were criminal acts going on and she acted to help. *Well, she admits that.* Even if all you want to believe, even if we take her at face value, which you shouldn't, *she's saying she thought this was related to the drug business and that's what was fishy about it.*

26

*She's also guilty of any other crime the other person commits if it was reasonably foreseeable.* Well, again, let's take her at face value, which, again, you shouldn't. *The drug business comes with violence. It comes with guns.* The circumstances under which she's being told to do this stuff and the things she's being told to do suggests very strongly that this is a serious crime that she's assisting in.

Segura bears the burden to demonstrate that these remarks constitute an error that is plain. *Ramey*, 721 N.W.2d at 302.

Minnesota Statutes section 609.05 addresses aiding-and-abetting liability. Under subdivision 1, a defendant "is criminally liable for a crime committed by another if the [defendant] intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." *Id.*, subd. 1. Subdivision 2, which describes the "[e]xpansive liability" doctrine, provides that a defendant "liable under subdivision 1 is *also* liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the [defendant] as a probable consequence of committing or attempting to commit the *crime intended*." *Id.*, subd. 2 (emphasis added).

Segura contends that the State was required to charge her with a drug-related offense in order to argue accomplice liability under subdivision 2 for crimes that were the foreseeable consequence of a "drug business." We have never required that a defendant be *charged* with a particular "target crime" to be found liable under Minn. Stat. § 609.05, subd. 2, for crimes committed in pursuance of that [target] crime that are "reasonably foreseeable . . . as a probable consequence" of committing the target crime.

But even if the State was not required to charge Segura with a drug offense, the prosecutor's remarks to the jury improperly expanded the doctrine of expansive liability.

27

It would be improper for a jury to convict Segura for crimes that were reasonably foreseeable to her as a probable consequence of a "drug business." Under the plain language of Minnesota Statutes section 609.05, expansive liability under subdivision 2 does not apply unless the State first proves that a defendant is liable under subdivision 1. Minn. Stat. § 609.05, subd. 2 ("A person liable under subdivision 1 is also liable for any other crime committed . . . ."). Accordingly, the jury would have to determine that Segura was criminally liable for a "drug business" under the aiding-and-abetting theory articulated in subdivision 1. But the criminality of the "drug business" was not identified and discussed in any detail to allow the jurors to reasonably determine which other crimes, if any, were reasonably foreseeable as a probable consequence of the "drug business."

As the California Supreme Court has recognized in the context of its own expansive liability doctrine, "a conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct." *People v. Prettyman*, 926 P.2d 1013, 1024 (Cal. 1996) (citation omitted) (internal quotation marks omitted). We believe that the prosecutor's view of aiding-and-abetting law, embodied in the "drug business" remarks, encouraged the jury to do just that—find Segura guilty on the belief that she intended to aid some unspecified illicit drug activity.[15]

---

[15] The State counters that any reference to the "drug business" and liability for crimes reasonably foreseeable as a result of the "drug business" was merely the prosecutor's attempt to respond to Segura's anticipated defense, *i.e.*, that she only believed that the phone calls she made were related to Wiggins's drug business. We have held that statements made during a prosecutor's closing argument do not constitute prejudicial misconduct when the prosecutor counters an anticipated defense argument. *See State v. Starkey*, 516 N.W.2d 918, 927 (Minn. 1994); *State v. Carter*, 289 N.W.2d 454, 455 (Minn.

28

Nevertheless, even if the prosecutor's remarks constitute an error that is plain, we conclude that the State has proved that any error did not affect Segura's substantial rights. In assessing whether the State has met its burden to demonstrate that there is no "reasonable probability that the error actually impacted the verdict," we consider several factors. *Jackson*, 773 N.W.2d at 121. These factors include "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007). "The trial court's instructions to the jury are also relevant in determining whether the jury was unduly influenced by the [prosecutor's] improper comments." *State v. Washington*, 521 N.W.2d 35, 40 (Minn. 1994).

While we hesitate to characterize the State's evidence of Segura's guilt as strong, the balance of factors leads us to conclude that there is no reasonable probability that the prosecutor's remarks actually impacted the verdict. As an initial matter, we note that the prosecutor's arguments concerning Segura's liability stemming from the "drug business" cannot reasonably be characterized as "pervasive." These comments are present in just one page of the 28-page transcript of the State's closing argument. *See Peltier*, 874 N.W.2d at 806 (concluding that a prosecutor's improper remarks were "isolated" when they "compris[ed] approximately one page of a 39–page closing argument"); *State v. Griese*,

---

1979). But here, the prosecutor did more than simply discredit Segura's defense. The prosecutor told the jury that it could find Segura guilty of any crimes that were reasonably foreseeable to her as a result of a "drug business." As discussed above, this statement misstated the law by improperly expanding aiding-and-abetting liability under Minn. Stat. § 609.05, subd. 2.

565 N.W.2d 419, 428 (Minn. 1997) (concluding that prosecutorial misconduct that "was limited to a little more than two pages in a more than 50–page closing argument" did not permeate the entire closing argument).

Moreover, the "drug business" theory was not the primary theory upon which the State urged the jury to find Segura criminally liable under an aiding-and-abetting theory. Immediately following the "drug business" comments, the prosecutor said to the jury:

> But don't accept her claims that she thought this was nothing more than relating to [Wiggins's] drug distribution business because these are the actions of people who know that they're planning and preparing to commit a violent crime, specifically. And in order to carry out these violent crimes, in order to accomplish them at all, to make them possible, she made all these calls and texts and contacts.
>
> . . . [Segura] knew full well her acts were enabling the commission of a crime. *She knew full well that the crimes planned were the kidnapping of Monique Baugh in order to get to [J.M.-M.].*

Accordingly, to prove the kidnapping, murder, and attempted murder charges, the prosecutor explicitly (and primarily) argued that Segura knew that the goal was not a "drug business" but to kidnap Baugh.

Segura also had an opportunity to rebut the prosecutor's remarks about the drug business in her own closing argument. Segura contends that this opportunity was undermined because the district court sustained objections to her argument about the knowledge requirement. It is true that the district court sustained one objection on the ground that Segura's counsel misstated the law. Nevertheless, counsel had other opportunities to address the significance of Segura's knowledge of drug-related crimes. For instance, Segura's counsel stated:

30

You heard a lot of evidence about drugs in this case; although, the crimes Ms. Segura is facing here are not drug related. You do not need to decide if she is guilty of any drug crimes or any involvement in that. The State is not asserting that the intended crime here was a drug case, but the history and evidence you have seen shows that that is the knowledge that Ms. Segura had about Mr. Wiggins.

Thus, Segura's one sustained objection did not completely undermine her opportunity to rebut the prosecutor's remarks about her involvement in a drug business.

Next, we consider the district court's jury instructions. The impact of a prosecutor's improper remarks during closing argument may be lessened by the district court's jury instructions. *Washington*, 521 N.W.2d at 40. Thus, in *Washington*, we concluded that a prosecutor's improper reference to a defendant's character in closing argument did not warrant reversal in part because the district court "instructed the jury that the arguments of an attorney are not evidence" and "also warned the jury that they should not permit sympathy, prejudice or emotion to influence their verdict." *Id.*

Here, the district court instructed the jurors that they must follow and apply the rules of law as given to them. Like the district court in *Washington*, the district court explained that the attorneys' arguments were not evidence and that the jury should disregard any statement of law from attorneys that differed from the jury instructions. Thus, if the jury were following the district court's instructions on this point, it would not have convicted Segura based on her intent to aid a drug business.

Accordingly, we conclude that the State proved that there is no reasonable possibility that any error on the part of the prosecutor in referencing Segura's intent to aid

31

a drug business affected the jury's verdict. Consequently, a new trial is not warranted because of prosecutorial misconduct.

III.

We next turn to Segura's argument that she is entitled to a new trial due to erroneous jury instructions. Segura raises several issues with the district court's jury instructions, including that the district court abused its discretion by denying her proposed accomplice liability instructions and that the instructions it issued were confusing and misleading. "We review a district court's jury instructions for an abuse of discretion." *State v. Huber*, 877 N.W.2d 519, 522 (Minn. 2016). "District courts are entitled to considerable latitude when selecting language for jury instructions, but an instruction that materially misstates the law is error." *State v. Carridine*, 812 N.W.2d 130, 144 (Minn. 2012). While we conclude that the district court did not abuse its discretion by denying Segura's proposed instructions, we agree with Segura that the district court's instructions materially misstated the law. Because we are not convinced that this error was harmless, Segura is entitled to a new trial. We therefore reverse Segura's remaining convictions and remand for further proceedings consistent with this opinion.[16]

---

[16] Segura also challenges the district court's transferred intent instruction. Specifically, she argues that it was error to include a transferred intent instruction when instructing the jury on first-degree premeditated murder because there was no evidence that either Baugh or J.M.-M. were unintended victims. Because we reverse Segura's conviction for first-degree premeditated murder on evidentiary sufficiency grounds, we need not address Segura's argument concerning the transferred intent instruction. Additionally, Segura argues that the cumulative effect of the district court's instructional errors deprived her of a fair trial. We do not address the merits of this argument in light of our conclusion that the district court's material misstatement of the law in its instructions requires reversal of Segura's convictions for kidnapping and felony murder.

A.

Segura first contends that the district court committed reversable error by denying her proposed accomplice liability instruction. A district court's "[d]enial of a requested jury instruction is reviewed for abuse of discretion." *State v. Wenthe*, 865 N.W.2d 293, 302 (Minn. 2015). "An abuse of discretion occurs when a decision as to whether to give an instruction is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Thoresen*, 921 N.W.2d 547, 553 (Minn. 2019) (citation omitted) (internal quotation marks omitted).

At trial, Segura requested that the district court add language drawn from *Rosemond v. United States*, 572 U.S. 65 (2014), to the accomplice liability instruction recommended by the jury instruction guides. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice— Jury Instruction Guides, Criminal*, CRIMJIG 4.01 (6th ed. 2022) ("CRIMJIG 4.01"). Specifically, she requested the addition of the following language: "The intent requirement is satisfied when a person actively participates in a criminal venture with advance knowledge of the circumstances constituting the elements of the charged offense. Intent must go to the specific and entire crime charged." The district court denied Segura's request because it concluded that *Rosemond* concerned accomplice liability under a federal statute and was therefore inapplicable to Segura's case.

As Segura concedes, *Rosemond* is not binding precedent because it involves the interpretation of a federal statute. At issue in *Rosemond* was the propriety of a district court's jury instructions for a charge alleging aiding-and-abetting liability for a violation

33

of 18 U.S.C. § 924(c), a two-pronged crime involving (1) the use of a firearm, (2) in connection with a crime of violence or a drug-trafficking crime. 572 U.S. at 67.

The United States Supreme Court concluded that the district court's jury instruction was erroneous because it permitted a finding of guilt based on the defendant's knowledge of the presence of a firearm *after* his participation in the underlying trafficking offense. *Id.* at 81–82. Based on its review of the criminal statute, the Court concluded that a proper instruction should have "explain[ed] that [the defendant] needed advance knowledge of a firearm's presence." *Id.* at 81. More specifically, the erroneous instruction allowed the jury to convict based on an intent "to advance some different or lesser offense" (*e.g.*, drug trafficking), but accomplice liability was predicated upon a finding of intent extending "to the specific and entire crime charged" (*i.e.*, armed drug trafficking). *Id.* at 76.

Segura's proposed language relates to the intent requirement of aiding-and-abetting liability. We have previously stated that jury instructions must explain that the "intentionally aiding" element requires that "the jury must find beyond a reasonable doubt that the defendant knew his alleged accomplice was going to commit a crime and the defendant intended his presence or actions to further the commission of that crime." *E.g.*, *State v. Milton*, 821 N.W.2d 789, 808 (Minn. 2012). Nevertheless, "we afford the district courts 'considerable latitude' in choosing the language explaining that element." *Id.* at 808 n.12 (quoting *State v. Ihle*, 640 N.W.2d 910, 916 (Minn. 2002)).

The State's assertion that we have already rejected a *Rosemond*-like instruction for accomplice liability instructions is inaccurate. *See State v. Onyelobi*, 879 N.W.2d 334, 354 (Minn. 2016) (declining to address whether *Rosemond* is "consistent with Minnesota's

accomplice liability law" because the Court's holding did not help the defendant). Nevertheless, we have never required that accomplice liability instructions explain that the "intentionally aiding" element "go to the specific and entire crime" as Segura argues. Therefore, we conclude that the district court did not abuse its broad discretion when it denied Segura's requested instruction.

B.

Segura next argues that the district court committed reversible error by giving a hybrid instruction that incorporated both principal and accomplice liability concepts. Specifically, she points to the district court's use of the language "the defendant or another (or others)" when describing the elements of the underlying crimes that Segura allegedly aided and abetted. Segura claims the addition of this language makes the jury instructions hybrid instructions, and that this language was confusing and misleading.

We review the district court's jury instructions for abuse of discretion. *State v. Guzman*, 892 N.W.2d 801, 816 (Minn. 2017). "A district court abuses its discretion if the challenged instruction confuses, misleads, or materially misstates the law." *Id.* "We review the jury instructions as a whole to determine whether they fairly and adequately explain the law." *Huber*, 877 N.W.2d at 522. However, "[a] mistaken jury instruction does not require a new trial if the error was harmless." *State v. Hall*, 722 N.W.2d 472, 477 (Minn. 2006). "An erroneous jury instruction is harmless only if it can be said that, beyond a reasonable doubt, the error had no significant impact on the verdict rendered." *Id.*

Hybrid instructions are "instructions that combine accomplice liability and the underlying elements." *Ezeka*, 946 N.W.2d at 408. The danger of such instructions is that

"when the district court conflates the elements of accomplice liability and the underlying substantive offense, the instruction risks omitting the 'intentionally aiding' element of accomplice liability." *Huber*, 877 N.W.2d at 524 n.3. As we stated in *Ezeka*, "[t]he era of hybrid instructions has ended," and now "district courts must separately instruct the jury on accomplice liability and on the underlying elements of the substantive offenses." 946 N.W.2d at 408.

We agree with Segura's contention that the district court issued impermissible hybrid instructions in this case. Based strictly on form, the district court's instructions comported with our case law. Consistent with our rule in *Ezeka*, the district court separately instructed the jury on the underlying elements of the four substantive offenses with which Segura was charged and on accomplice liability. Moreover, the district court gave a separate accomplice liability instruction after instructing the jury on the elements of each substantive offense, as recommended by the CRIMJIG on accomplice liability. *See* CRIMJIG 4.01; *see also* Minn. Stat. § 609.05.

However, the practical effect of the district court's addition of the language "the Defendant or another" to the instructions was to "combine accomplice liability and the underlying elements"—the concern that led us to put an end to hybrid instructions. *Ezeka*, 946 N.W.2d at 408. Not only did this additional language materially misstate the law, but it also made the instructions confusing and misleading. The district court added this disputed language to its instructions on the underlying elements of each substantive crime.

Consider, for example, the instruction on kidnapping to commit great bodily harm or to terrorize. The district court's instructions for the underlying elements provided:

The elements of kidnapping to commit great bodily harm/terrorize are first, the defendant *or another (or others)* confined or removed Monique Baugh from one place to another without her consent. . . .

Second, the defendant *or other persons* acted for the purpose of committing great bodily harm on the person of Monique Baugh or terrorizing Monique Baugh. . . . It is not necessary that the defendant *or that other person(s)* actually caused great bodily harm to Monique Baugh or have terrorized Monique Baugh so long as the defendant *or that other person(s)* intended to do so.

Third, some part of the defendant's act took place on or about December 29th through 31st, 2019, in Hennepin County.

(Emphasis added.) The district court then transitioned from the elements of the underlying crime to the accomplice liability instruction by telling the jurors:

*If you find that each of these elements has been proved beyond a reasonable doubt, the defendant is guilty of this charge*; if you find that any element has not been proved beyond a reasonable doubt, the defendant is not guilty of this charge, unless you find the State has proven beyond a reasonable doubt that the defendant is liable for this crime committed by another person according to the instruction below.

(Emphasis added.) When viewed together, these instructions materially misstate the law because they—by their plain language—allow the jury to convict Segura of kidnapping for the actions of others *without* reaching the issue of her liability under an aiding-and-abetting theory.[17] The jury could find that the State proved beyond a reasonable doubt that (1) another person confined or removed Monique Baugh from one place to another without her consent, (2) the other person acted for the purpose of committing great bodily harm on the person of Monique Baugh or terrorizing Monique Baugh, and (3) that Segura took some

---

[17] This format of instructing on the elements of the underlying crime with the language "the defendant or another" and then instructing on accomplice liability is repeated for each count. The district court used this format for both its oral and written instructions.

action on December 29–31 in Hennepin County. Under the plain language of the instructions, the jury could convict Segura of kidnapping based on these findings alone. Thus, we conclude that the district court abused its discretion by providing hybrid instructions that materially misstated the law.

But this conclusion does not end our analysis. Segura is entitled to a new trial only if these erroneous instructions were not harmless. "An erroneous jury instruction is harmless only if it can be said that, beyond a reasonable doubt, the error had no significant impact on the verdict rendered." *Hall*, 722 N.W.2d at 477.

We presume that juries follow instructions given by the district court. *State v. Gatson*, 801 N.W.2d 134, 151 (Minn. 2011). Given that presumption, and based on the material misstatement of the law in the jury instructions and the overwhelming evidence that Berry and Davis kidnapped and murdered Baugh, we cannot say—beyond a reasonable doubt—that the erroneous instructions had no significant impact on the jury's verdict. Therefore, we conclude that the erroneous jury instructions were not harmless beyond a reasonable doubt and that Segura is entitled to a new trial. We reverse Segura's convictions for kidnapping and felony murder and remand for proceedings consistent with this opinion.

IV.

Finally, Segura argues that the district court erred in admitting evidence that she contends should have been excluded under Minn. R. Evid. 410. Specifically, Segura points to the testimony that the State elicited from her concerning statements she made during plea proffers. Segura filed a pretrial motion to prohibit the State from admitting her recorded proffer statement and transcript into evidence. However, she did not object at

trial to the questions the State asked her on cross-examination related to her proffer statements.

We review an unobjected-to admission of evidence for plain error affecting substantial rights. *State v. Brown*, 792 N.W.2d 815, 820–21 (Minn. 2011). Accordingly, we must first determine whether Segura has established that the admission of her proffer statements was an error that was plain. *See Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022). On the question of whether an error occurred, "[i]n determining whether admission of evidence violates Minn. R. Evid. 410, we review a district court's findings of fact for clear error and review the court's legal conclusions de novo." *Brown*, 792 N.W.2d at 821.

Minnesota Rule of Evidence 410 addresses the admissibility of a defendant's proffer statements:

> Evidence of . . . an offer to plead guilty . . . to the crime charged or any other crime or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil, criminal, or administrative action, case, or proceeding whether offered for or against the person who made the plea or offer.

"Rule 410 safeguards the confidentiality of plea negotiations in order to foster meaningful dialogue between the parties and to promote the disposition of criminal cases by compromise." *State v. Blom*, 682 N.W.2d 578, 620 (Minn. 2004). But "[t]he evidentiary safeguards provided for under Rule 410 for statements made in connection with a plea or plea offer . . . may be waived." *Id.* at 617. "Waiver 'is an intentional relinquishment of a known right or privilege, and its validity depends . . . upon the particular facts and

circumstances surrounding the case.' " *Id.* (quoting *State v. Richards*, 456 N.W.2d 260, 264 (Minn. 1990)).

We first address whether Segura validly waived the protections of Rule 410. Before the proffer meeting at which Segura made the statements at issue, she signed a written agreement. This agreement states in relevant part:

> If, during this meeting, Elsa Segura implicates herself in any crime, any statements Ms. Segura makes during the meeting will not be offered as evidence in the State's case-in-chief against her. Statements made by Ms. Segura during the meeting may only be used to cross-examine . . . her should she testify at trial.

Both Segura and her counsel signed the agreement, acknowledging that they had reviewed it together. Segura then attended the proffer meeting with her attorney. Based on this written agreement, as well as the other surrounding facts and circumstances, we conclude that Segura validly waived the evidentiary protections of Rule 410.

We turn next to the issue of whether the State permissibly used Segura's proffer statements as impeachment evidence on cross-examination.[18] The Minnesota Rules of Evidence permit the State to impeach a witness's testimony at trial with evidence of her bias and with her prior inconsistent statements. Minn. R. Evid. 613 (prior inconsistent statements); Minn. R. Evid. 616 (evidence of bias); *State v. Larson*, 787 N.W.2d 592, 598 (Minn. 2010) ("Evidence of bias of a witness is admissible to attack the credibility of a

---

[18]    If the protections of Rule 410 apply, "[t]here is no impeachment exception to the general rule that statements made in connection with plea negotiations are inadmissible." *State v. Robledo-Kinney*, 615 N.W.2d 25, 30 (Minn. 2000). Here, however, Segura validly waived her rights under Rule 410. Therefore, the admissibility of her statements for impeachment purposes are subject to other rules of evidence.

40

witness."); *State v. Knaffla*, 243 N.W.2d 737, 740 (1976) ("It is well established that proper impeachment evidence includes prior inconsistent statements.").

On direct examination, Segura testified that, after she became aware of Baugh's death, she told investigators about the calls she had made to Baugh. On cross-examination, the State questioned Segura about her motive for speaking to law enforcement and statements she made during the proffer meeting that were inconsistent with her trial testimony.[19] We conclude that Segura's proffer statements were admissible as impeachment evidence as it pertained to her bias and her prior inconsistent statements. Accordingly, Segura has failed to establish an error. Segura's argument that the district court committed reversible error by admitting evidence related to her proffer statements is without merit.

\*    \*    \*

We reach our decisions in this difficult case with full recognition of the grievous loss suffered by Baugh's family and the communities involved with this case, as well as the injuries inflicted on J.M.-M. We realize that our opinion may result in another trial involving these difficult facts and intensify the grief of those affected by the senseless acts of violence perpetrated on Baugh and her boyfriend. Nevertheless, we are duty-bound to ensure that a defendant in a criminal trial is not convicted based on insufficient evidence

---

[19] For instance, Segura acknowledged, in response to the State's questioning, that she provided information to law enforcement "to get a plea deal." After Segura testified on direct examination that J.M.-M. had been at her house "four to five times" and that she would not characterize him as a friend, the State impeached Segura with a statement she made during the proffer meeting in which she said she was friends with J.M.-M.

41

or erroneous jury instructions that were not harmless beyond a reasonable doubt.  On this record, we conclude that these standards were not met.

## CONCLUSION

For the foregoing reasons, we reverse Segura's convictions and remand for further proceedings on the kidnapping and felony murder charges consistent with this opinion.

Reversed and remanded.


PROCACCINI, J, not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CONCURRENCE & DISSENT

THISSEN, Justice (concurring in part, dissenting in part).

I concur in the court's holdings in this case with one exception. I disagree with the court's holding that there is sufficient evidence to sustain appellant Elsa Segura's convictions for aiding and abetting kidnapping and first-degree felony murder during the commission of a kidnapping.

Among other things, Segura challenges whether the State presented sufficient evidence to support, beyond a reasonable doubt, Elsa Segura's four convictions under aiding-and-abetting theories of criminal liability: first-degree premeditated murder under Minn. Stat. § 609.185(a)(1) (2022); attempted murder under Minn. Stat. § 609.17 (2022); kidnapping under Minn. Stat. § 609.25, subd. 1(3) (2022); and first-degree felony murder with a predicate act of kidnapping under Minn. Stat. § 609.185(a)(3) (2022). Segura is challenging the sufficiency of the State's evidence on all four counts.

The court concludes that insufficient evidence exists to support Segura's convictions for first-degree premeditated murder and attempted first-degree premeditated murder under aiding-and-abetting theories of liability. I agree.

The court also concludes that there is sufficient evidence to sustain Segura's convictions for aiding and abetting kidnapping and first-degree felony murder during the commission of a kidnapping. Both crimes require the State to prove beyond a reasonable doubt that Segura knew that the principals in this crime would commit kidnapping and that Segura intended for her actions to further the commission of the crimes. To reach that

holding, the court states that the facts proved support only *one* reasonable inference—that Segura knew that the principals planned to kidnap the victim, Monique Baugh, and that she intended for her actions to further that crime. In fact, another reasonable inference exists—that Segura knew that the principals planned some criminal or illicit activity but not kidnapping and intended her actions to further that other crime or activity. And because that alternative reasonable inference exists, our precedent and the constitution compel the conclusion that the State did not demonstrate beyond a reasonable doubt that Segura aided and abetted a kidnapping. Therefore, I respectfully dissent.

Kidnapping is defined in Minnesota statute as follows:

> Whoever, for any of the following purposes, confines or removes from one place to another, any person without the person's consent . . . , is guilty of kidnapping and may be sentenced as provided in subdivision 2:
> (1) to hold for ransom or reward for release, or as shield or hostage; or
> (2) to facilitate commission of any felony or flight thereafter; or
> (3) to commit great bodily harm or to terrorize the victim or another; or
> (4) to hold in involuntary servitude.

Minn. Stat. § 609.25, subd. 1 (2022). A person commits first-degree felony murder when she "causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit . . . kidnapping." Minn. Stat. § 609.185(a)(3). Thus, to be convicted of kidnapping or felony murder with a predicate act of kidnapping, the State must prove beyond a reasonable doubt that the defendant engaged in the conduct that qualifies as kidnapping under the statute.

Segura is charged with *aiding and abetting* kidnapping and felony murder for which the kidnapping is the predicate crime. Minn. Stat. § 609.05, subd. 1 (2022) ("A person is

C/D-2

criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."). The "intentionally aids" element requires that the defendant "*knew* that [her] alleged accomplices were going to commit a crime" and that the defendant "*intended* [her] presence or actions to further the commission of that crime." *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007) (emphasis added). To convict Segura of aiding and abetting kidnapping and felony murder while committing a kidnapping, then, the State must prove beyond a reasonable doubt that Segura *knew* that her accomplices were going to engage in the conduct described in the kidnapping statute and also "*intended* [her] presence or actions to further the commission of" the kidnapping. *Id.*[1] The question we must answer is whether the State presented sufficient evidence to meet that burden.

It is not controversial to say that "[o]ur review of the sufficiency of the evidence proceeds against the fundamental background principle that a person in this country is innocent until proven guilty on all elements of a crime beyond a reasonable doubt." *State v. Colgrove*, 996 N.W.2d 145, 157 (Minn. 2023) (Thissen, J., dissenting). For sufficiency-of-the-evidence cases, we use two different tests based on the evidence admitted at

---

[1]     If a person is liable as an accomplice for a crime under subdivision 1 of Minnesota Statutes section 609.05, the person is "also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." *Id.*, subd. 2 (2022). The intentional death of a person may be a foreseeable consequence of a kidnapping. *See, e.g.*, *State v. Berrisford*, 361 N.W.2d 846, 851 (Minn. 1985). Because I conclude that the State did not sufficiently prove Segura knew that her accomplices were going to kidnap Baugh, I do not reach the question of the reasonable foreseeability of Baugh's death.

trial—the direct-evidence test and the circumstantial-evidence test. When direct evidence establishes an element of the crime, we painstakingly review the record "to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quoting *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989)).

But when a jury must draw inferences from direct evidence to ascertain a fact—that is, when it uses circumstantial evidence[2]—we apply a heightened two-step process. *Colgrove*, 996 N.W.2d at 150; *State v. Al-Naseer*, 788 N.W.2d 469, 474–75 (Minn. 2010) (stating that the heightened-scrutiny standard applies to any disputed element of the conviction that is based on circumstantial evidence). At the first step, we identify the facts proved by direct evidence that are uncontroverted or consistent with the jury's verdict. *State v. Hassan*, 977 N.W.2d 633, 640 (Minn. 2022). It is *only* at this stage that we defer to the jury. *Id.* We accept direct evidence that is consistent with the guilty verdict and reject any evidence that is inconsistent with the verdict. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010) (citing *State v. Stein*, 217 N.W. 683, 684 (Minn. 1928)). The second step requires us to independently review the facts proved and assess whether the inference drawn by the jury from the facts proved is rational and whether any inferences contrary to

---

[2]     *See Evidence*, *Black's Law Dictionary* (11th ed. 2019) (defining circumstantial evidence as "[e]vidence based on inference and not on personal knowledge or observation" and direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption"); *Bernhardt v. State*, 684 N.W.2d 465, 477 n.11 (Minn. 2004) (defining direct and circumstantial evidence).

the jury verdict are rational. *Al-Naseer*, 788 N.W.2d at 473–74. Importantly, as the court states, we do not defer to the jury's choice between reasonable inferences at this stage. Here, everyone agrees that the circumstantial-evidence test applies.

With that background, I analyze the sufficiency of the evidence to support Segura's convictions for kidnapping and felony murder during the commission of a kidnapping under aiding-and-abetting theories of liability. No one disputes that the principals (Cedric Berry and Berry Davis) who committed these tragic crimes kidnapped Baugh, transported Baugh to her home where they shot her boyfriend, and then drove Baugh to an alley in Minneapolis and shot her. No one disputes that Lyndon Wiggins helped Berry and Davis plan and execute these crimes. And everyone agrees that Segura arranged for Baugh to come to the location where Baugh was kidnapped, but that Segura was not present when the kidnapping occurred. Rather, Segura is charged with aiding and abetting the crimes of kidnapping and felony murder with a predicate crime of kidnapping. The question here, as the court aptly points out, is "what Segura *knew* when she scheduled the house showing with Baugh." *Supra* at 17.

I start by identifying the facts that are not inconsistent with the jury's verdict. The relevant facts proved are as follows: Wiggins had a falling-out with J.M.-M. Segura followed J.M.-M. on social media and saw posts about Baugh. Wiggins instructed Segura to call a realtor. Segura knew that she was scheduling a house viewing with a realtor and she called the realtor under suspect circumstances (she used a fake name, called from a phone that Wiggins provided, and left her house whenever she used the phone). Segura

had dated Wiggins for several years and she knew that Wiggins had previously committed an aggravated robbery during which he kidnapped a victim.

I agree with the court that the facts proved support a reasonable inference that Segura is guilty of the kidnapping under an aiding-and-abetting theory of criminal liability. As the court appropriately reasons, the suspicious circumstances under which Segura made the house showing (using a different phone, arranging the house showing under a fake name, and making calls away from her house) in tandem with Segura's knowledge that Wiggins's criminal history included an aggravated robbery involving a kidnapping, lead to a rational inference (a very low bar) that Segura knew that Wiggins was planning to kidnap Baugh. *Supra* at 19, 22.

I conclude, however, that the facts proved are also consistent with a reasonable hypothesis that Segura did not know that Wiggins was planning to *kidnap* Baugh. Rather, as Segura contends, a reasonable person could infer from the facts proved that she believed she was assisting Wiggins with some crime less serious than kidnapping.

The court dismisses this alternative inference as unreasonable because Segura knew Wiggins had previously participated in an aggravated robbery with a "kidnapping component." *Supra* at 5–6. But simply because Segura knew that Wiggins had previously participated in a crime where a victim was kidnapped does not inevitably mean that Segura knew that Wiggins planned a kidnapping in this case. Again, that is a reasonable inference but not the *exclusive* reasonable inference. That conclusion is apparent on the face of the assertion; another (but not the only alternative) reasonable inference from Wiggins's prior conduct is that Segura thought Wiggins was going to commit robbery. The same facts

could support a more general conclusion that Wiggins was going to assault Baugh or commit some other crime that would get at J.M.-M. through Baugh. And all the other facts proved (Segura's awareness of a relationship between Baugh and her boyfriend, Wiggins's dispute with J.M.-M., the suspicious circumstances of Segura's call to arrange a house showing where Baugh would be isolated) are also consistent with an alternative reasonable inference that her accomplices would commit a crime other than kidnapping.

It is also important that the relevant circumstances proved are those that go to the disputed element; namely, what did Segura know when she scheduled the house showing with Baugh. There is *no direct evidence* that Segura knew that Wiggins, Berry, and Davis were using a U-Haul or that they had ammonia or bleach with them and so those "facts" cannot be considered circumstances proved concerning Baugh's knowledge under the circumstantial-evidence test. The circumstances proved include only those facts established by direct evidence. *State v. Harris*, 895 N.W.2d 592, 599 n.4 (Minn. 2017); *Colgrove*, 996 N.W.2d at 159 (Thissen, J., dissenting). The court focuses on the fact that Wiggins called Segura around the time the U-Haul was rented, but that is not direct evidence that Segura knew a U-Haul was rented. One reasonable inference is that Wiggins told Segura that he had just rented a U-Haul. But it is not an unreasonable inference that Wiggins was, for example, simply checking in on the status of Segura's role in the crime with no mention of the U-Haul. And the court makes *no* effort to show Segura knew about the ammonia or bleach; it just asserts that fact.

In short, based on all the facts proved, it is reasonable to infer that Segura knew that her accomplices would commit a different crime (such as robbery or assault) to get back at

J.M.-M. None of this reflects well on Segura, of course. Her conduct in this case was appalling and the outcome was tragic. But that is not the question before us. Based on how the State charged the case—and the facts the State proved by direct evidence at trial—the question is whether the State proved beyond a reasonable doubt that Segura knew that her accomplices intended to kidnap Baugh.

To convict Segura of aiding and abetting kidnapping and felony murder with a predicate crime of kidnapping, the State has the burden to prove beyond a reasonable doubt that Segura knew that her accomplices were going to commit kidnapping. Any reasonable hypothesis that Segura did not know about the kidnapping is thus a reasonable hypothesis of innocence. The court adopts a much too constricted view of what constitutes a rational inference; it is in essence deferring to the jury's choice of inferences. Because it is reasonable to infer that Segura knew that she was aiding Wiggins in a crime other than kidnapping, it follows that the State did not prove beyond a reasonable doubt that Segura intentionally aided in the kidnapping of Baugh. Therefore, under our case law and the constitution, the State did not prove beyond a reasonable doubt an essential element of the crimes of kidnapping or felony murder with kidnapping as a predicate offense and her convictions must be reversed.

ANDERSON, Justice (concurring in part, dissenting in part).

I join in the concurrence in part and dissent in part of Justice Thissen.